CARAWAY, J.
| tThis case involves the application of the new medical treatment guidelines for a workers’ compensation claim. The claim is for back surgery for a disabled, middle-aged plaintiff -with degenerative disc disease. Plaintiff, who worked in the air conditioner repair business, was injured on the job upon falling from a ladder. After the unsuccessful resolution of plaintiffs back pain, which involves bilateral radicu-lar symptoms, the treating physician sought authorization for surgery for a multilevel laminectomy/discectomy of the lumbar spine. After rejection by the employer’s utilization review company, appeal was made to the Medical Director. The request for surgery was then denied by the Medical Director pursuant to the guidelines. Presentation of the claim was then made to the workers’ compensation judge, who affirmed the decision of the Medical Director. This appeal followed, and from our review of the new proceedings for medical treatment and the guidelines, we affirm the denial of the requested medical treatment.
Facts and Procedural History
On May 3, 2012, Daryl Gilliam was injured on the job with Brooks Heating & Air Conditioning when parts of an air conditioner duct fell from a ceiling, striking Gilliam on his head and shoulders and propelling him off a ladder onto the concrete floor. Gilliam was 49 years old at the time of the accident. He fell six feet onto his right hip and buttock and injured his lower back.
On May 14, 2012, Gilliam saw neurosurgeon, Dr. Marco Ramos, |2complaining of low back pain radiating down his right hip and lower leg associated with numbness in those regions. Gilliam also stated that the pain had been radiating down the left lower extremity. Dr. Ramos concluded that Gilliam exhibited manifestations of lumbo-sacral radiculopathy and ordered an MRI of the lumbosacral spine. He advised Gilliam to stay off work until the MRI results were obtained.
The MRI of June 25, 2012, revealed the following:
Degenerative narrowing and loss of disc space signal are moderate in degree at L4-5 and also at Ll-2 with mild to moderate degenerative narrowing and loss of signal also noted at L2-3 and L3-4. At Ll-2, there is a moderate to large broad-based central disc herniation with annular tear and moderate compression of the thecal sac centrally. L2-3 shows a moderate broad-based central disc bulge with annular tear. L3-4 shows a small to moderate central disc bulge slightly left paracentral in prominence with small annular tear noted. L4-5 shows a small to moderate broad-based central disc bulge left paracentral in prominence with some mild impingement of the L5/S1 nerve root of the left suspected. L5/S1 is relatively normal. The conus is in normal position with normal appearance. The bony structures are normal. Soft tissue landmarks are normal and visualized portions of the retroperitoneum are normal.
Gilliam saw Dr. Ramos again on June 26, 2012, with more weakness and numbness in his left hand. His main complaint was persistent low back pain radiating to the posterior aspect of the right lower extremity, not relieved with medication. Dr. Ramos reiterated his view that Gilliam had manifestations of lumbosacral radicu-lopathy. He had reviewed the MRI and noted that the study showed “significant extradural defects at Ll-2, L2-3, L3 — 1 and L4-5.” Dr. Ramos recommended up to four weeks of physical therapy.
*737 Gilliam returned to Dr. Ramos on July 31, 2012, complaining of continued deterioration of his condition. The low back pain had radiated | sinto the posterior aspect of both lower extremities, especially the right. Gilliam had discontinued physical therapy after seven sessions because of further aggravation of symptoms. Because of the MRI results, Gilliam’s lack of response to three months of rest, and the failed attempt at physical therapy, Dr. Ramos recommended surgical treatment including a “minimally invasive right Ll-2, L2-3, L3^1 and L4-5 laminectomy and microdis[c]ectomy.”
On August 6, 2012, Dr. Ramos sought authorization for the surgery from Novare Utilization Review Company (“Novare”) in accordance with the workers’ compensation claim review requirements. Novare denied the request on August 8, 2012. Dr. Ramos appealed the denial to Medical Director,[1] Dr. Christopher Rich, who denied the claim on September 10, 2012.
On September 11, 2012, Gilliam presented to Dr. Ramos in deteriorating condition. He complained that his lower back pain had radiated into the right groin, anterior aspect of the thigh and the dorsal and lateral aspect of the right foot. Medication afforded Gilliam no relief. Dr. Ramos concluded that Gilliam’s manifestations of multiple lumbosacral radiculopathy “have further deteriorated.” He reiterated that his review of the MRI (showing “significant extradural defects” at Ll-2, L2-3, L3-4 and L4-5) made Gilliam a candidate for surgical intervention.[2]
| ¿On November 5, 2012, Gilliam received a second medical opinion from Dr. Donald R. Smith.[3] After reviewing Gilliam’s history and the MRI, Dr. Smith concluded that Gilliam suffered the following:
Degenerative lumbar disc disease and spondylosis involving multiple levels with no levels showing any significant mechanical encroachment on the spinal canal and no significant levels of steno-sis. These changes are chronic, longstanding in nature and not the type that would ordinarily be associated with a single episode of trauma.
In his report, Dr. Smith made the following recommendations in relevant part:
* * *
3. Prognosis for recovery is poor as he has currently experienced no improvement over several months on analgesics and muscle relaxants. He has not undergone a good trial of physical therapy, but this was recommended and discontinued because the patient complained of some aggravation of pain.
[[Image here]]
7. I agree that surgery is not indicated in this patient. I do not feel that surgery is an indication regardless of his response to therapy, but I do feel that he should have a good program of physical therapy and reconditioning exercises with encouragement to persist with these.
[[Image here]]
*738 9. I do feel that further treatment is required in this patient. Also, feel that with the findings reported above on the lumbar imaging that Mr. Gilliam is not a candidate to return to heavy strenuous work activities which require heavy lifting above 100 pounds. Furthermore, I do not believe that any surgical procedures will allow him to return to work activities at that level.
10. I do feel that Mr. Gilliam’s medical care is reasonable and necessary for injuries sustained in May 2012. While the radiographic changes described are certainly pre-existent, the symptoms were undoubtedly aggravated by his fall and have been further complicated by deeon-ditioning and poor muscle tone resulting from his long period of inactivity as well as the emotional stresses associated with his inability to work.
11. See the answer to # 10, but I do feel that this loss of work time is | ¿related to the injury despite the presence of underlying pre-existing condition.
12. Certainly he cannot return to unrestricted work activities at this time and furthermore, I do not believe that there is any therapy available including the suggested surgery that would permit him to return to work activities requiring lifting of greater than 100 pounds. I feel that some program of rehabilitation with efforts to qualify him for job activities that would not require heavy manual lifting would be indicated in this gentleman. I do believe that he should be able to return to work in at least a light to medium work activity category, but a Functional Capacity Evaluation would be of assistance in making a definitive decision in this regard.
[[Image here]]
14. I do not feel that he has reached maximum medical improvement. I continue to feel that he may achieve some improvement by a well structured physical therapy program. Also the Functional Capacity Evaluation would be of some assistance with regard to this answer.
On November 19, 2012, Gilliam returned to Dr. Ramos complaining of further worsening of his condition with the development of urinary incontinence. Dr. Ramos again recommended surgical treatment. Dr. Ramos noted his review of Dr. Smith’s opinion, and agreed that Gilliam had not reached maximum medical improvement and was in no condition to resume work activities.
On December 20, 2012, Dr. Ramos submitted a third request for authorization of the minimally invasive right laminectomy and microdiscectomy. Novare denied the claim as not being in accordance with the Medical Treatment Schedule[4] of La. R.S. 23:1203.1(D) on December 27, 2012.[5] The claim was denied on these grounds:
|fiDr. Ramos fails to document a specific correlation of the patient’s objective symptomatology with imaging study of the lumbar spine. The request for a right laminectomy with microdiscectomy at the Ll-2, L2-3, L3-4, L4-5 is too broad considering the patient’s current presentation.... Given that the request *739 is excessive in nature for a multilevel laminectomy/discectomy without specific correlation with imaging studies, the request for minimally invasive lumbar lam-inectomy at the right Ll-2, L2-3, L3-4, L4-5 ... is non-certified.
Dr. Ramos appealed the decision to the Medical Director, who denied the surgery request on January 22, 2013. Specifically, the denial stated as follows:
All records submitted were reviewed. (58 pages). The documentation does not support the approval of the requested services per the Louisiana Medical Treatment Guidelines (MTG) noted below.[6]
Provider notes a reference to a SMO by Dr. Donald Smith; this SMO record was not submitted. The weakness, sensation, and reflex changes have been present since the initial exam on 05.14.2012. Lumbar imaging report dated 06.25.2012 notes Ll-2 HNP with moderate compression of the thecal sac; other levels noted with disc bulge but no mention of central or foraminal neuro-compression.
The clinical records do indicate the need for decompression, with worsening of symptoms including urinary incontinence, and previously and current physical findings.
However the requested four level lami-nectomy/discectomy is not indicated. Although weakness and functional concerns are present, the specific levels of compression must correlate with the clinical exam, clinical testing, and imaging reports.
Additionally, the Medical Director included the following notes:
1) All operative interventions must be based upon positive correlation of clinical findings, clinical course, and diagnostic tests. A comprehensive assimilation of these factors must lead to a specific diagnosis with positive identification of pathologic condition(s).
|72) All patients being considered for surgical intervention should first undergo a comprehensive neuro-musculoskele-tal examination.
3) Surgical indications include all of the following: Primary radicular symptoms, radiculopathy and radiculitis on exam, correlating imaging study, and failure of non-surgical care.
On February 7, 2012, Gilliam filed a disputed claim for compensation seeking reversal of the Medical Director’s decision. The case was heard before the Workers’ Compensation Judge (“WCJ”) on August 1, 2013. Dr. Ramos’s medical records and his deposition dated July 11, 2013, were placed in evidence. Also, copies of the decisions of the Medical Director and No-vare and the second medical opinion of Dr. Smith were entered into evidence. The parties submitted the case upon arguments and pretrial briefs.
After taking the matter under advisement, the WCJ affirmed the decision of the Medical Director on September 16, 2013. In later written reasons for judgment, the WCJ stated as follows:
Dr. Ramos’[s] deposition ... strongly disputes Dr. Rich’s conclusion. However, in addition to Dr. Rich’s report, defendants offered the Second Medical Opinion of their chosen neurosurgeon, Dr. Donald R. Smith. After reviewing the medical records and examining the claimant on November 2, 2012, Dr. *740 Smith diagnosed degenerative disc disease and spondylosis at multiple levels of the lumbar spine. However, he found no indication of significant encroachment on the spinal canal and no significant stenosis. Like Dr. Rich, he concluded that the proposed surgery was not necessary.
Before the enactment of the MTG, this court might have concluded that the preponderance of the evidence weighs in favor of the proposed surgery. That is no longer the standard. La. R.S. 23:1203.1 imposes the burden on Mr. Gilliam to show by clear and convincing evidence that Dr. Rich’s conclusion was contrary to the Medical Treatment Guidelines. Claimant’s proof fails to meet that burden.
Gilliam has appealed the ruling.
IsWorkers’ Compensation Law — The New Medical Treatment Schedule/Guidelines and Procedure
A workers’ compensation claimant may recover medical treatment that is reasonably necessary for the treatment of a medical condition caused by a work injury. La. R.S. 23:1203(A); Church Mut. Ins. Co. v. Bardar, 13-2351 (La.5/7/14), 145 So.3d 271.
Enacted by the legislature in 2009, La. R.S. 23:1203.1 is the product of a combined endeavor by employers, insurers, labor, and medical providers to establish meaningful guidelines for the treatment of injured workers. La. R.S. 23:1203(A); Church, swpra. La. R.S. 23:1203.1 was enacted with the express intent that, with the establishment and enforcement of the medical treatment schedule, medical and surgical treatment, hospital care, and other health care provider services shall be delivered in an efficient and timely manner to injured employees. La. R.S. 23:1203.1(L).
Medical necessity includes services that are in accordance with the MTG and are clinically appropriate and effective for the patient’s illness, injury or disease. LAC 40:1.2717. To be medically necessary, a service must be consistent with the diagnosis and treatment of a condition or complaint, in accordance with the MTG, not solely for the convenience of the patient, family, hospital or physician and furnished in the most appropriate and least intensive type of medical care setting required by the patient’s condition. Id.
Regarding the procedure involved in pursuing a claim for medical treatment under this new law, La. R.S. 23:1203.1 provides in relevant part:
I. After the promulgation of the medical treatment schedule, | throughout this Chapter, and notwithstanding any provision of law to the contrary, medical care, services, and treatment due, pursuant to R.S. 23:1203, et seq., by the employer to the employee shall mean care, services, and treatment in accordance with the medical treatment schedule. Medical care, services, and treatment that varies from the promulgated medical treatment schedule shall also be due by the employer when it is demonstrated to the medical director of the office by a preponderance of the scientific medical evidence, that a variance from the medical treatment schedule is reasonably required to cure or relieve the injured worker from the effects of the injury or occupational disease given the circumstances.
J. (1) After a medical provider has submitted to the payor the request for authorization and the information required by the Louisiana Administrative Code, Title 40, Chapter 27, the payor shall notify the medical provider of their action on the request within five business days of receipt of the request. If any *741 dispute arises after January 1, 2011, as to whether the recommended care, services, or treatment is in accordance with the medical treatment schedule, or whether a variance from the medical treatment schedule is reasonably required as contemplated in Subsection I of this Section, any aggrieved party shall file, within fifteen calendar days, an appeal with the office of workers’ compensation administration medical director on a form promulgated by the director. The medical director shall render a decision as soon as is practicable, but in no event, not more than thirty calendar days from the date of filing.
[[Image here]]
K. After the issuance of the decision by the medical director of the office, any party who disagrees with the decision, may then appeal by filing a “Disputed Claim for Compensation,” which is LWC Form 1008. The decision may be overturned when it is shown, by clear and convincing evidence, the decision of the medical director or associate medical director was not in accordance with the provisions of this Section.
Before the enactment of La. R.S. 28:1203.1, the determination of what medical treatment was appropriate was entrusted first to the insurer. La. R.S. 23:1142. If a dispute arose regarding whether a particular treatment was reasonable and necessary, the task of resolving the dispute was given to the WCJ who would review the case under the preponderance of the evidence standard to determine what treatment was medically necessary under the circumstances. Church, supra. Under the new law, a | inclaimant seeking judicial review of the Medical Director’s decision must prove the necessity of the sought-after medical treatment by clear and convincing evidence. Id. However, under La. R.S. 23:1203.1(1) and (M)(2),[7] the claimant’s initial burden before the Medical Director remains one of proof by a preponderance of the evidence. Id.
In this case, the ruling of the Medical Director addressed the treatment requested by Gilliam for his back injury by specifically referencing the highlighted portions of the following MTG as they existed at the time of the decision that addressed spine and low pack pain and the options for treatment as follows:
1) LAC 40:I.2015(A):
(8) Surgery should be contemplated within the context of expected functional outcome and not purely for the purpose of pain relief. The concept of “cure” with respect to surgical treatment by itself is generally a misnomer. All operative interventions must be based upon positive correlation of clinical findings, clinical course and diagnostic tests. A comprehensive assimilation of these factors must lead to a specific diagnosis with positive indication of pa-thologic conditions.
2) LAC 40:1.2023:
(A) All operative interventions must be based upon positive correlation of clinical findings, clinical course, and diagnostic tests.
(B) Operative treatment is indicated when the natural history of surgically treated lesions is better than the natural history for non-operatively treated lesions. All patients being considered for surgical intervention should *742 first undergo a comprehensive neu-ro-musculoskeletal examination to identify mechanical pain generators that may respond to nonjsurgicalu techniques or may be refractory to surgical intervention.
[[Image here]]
(F)(1).[8] Discectomy
(a) Description: to enter into and partially remove the disc.
(b) Complications. Appropriate medical disclosure should be provided to the patient as deemed necessary by the physician.
(c) Surgical Indications: To include all of the following: Primary radi-cular symptoms, radiculopathy on exam, correlating imaging study, and failure of non-surgical care. There is good evidence that surgery provides initial improvement of radi-cular symptoms with respect to chronic low back pain. There is conflicting evidence that the long-term outcome differs from that of the natural history of healing.
[[Image here]]
(F)(3). Laminotomy/lamineetomy/for-amenotomy/facetectomy
(a) Description. These procedures provide access to produce neural decompression by partial or total removal of various parts of vertebral bone.
(b) Complications. Appropriate medical disclosures should be provided to the patient as deemed necessary by the treating physician.
3) LAC 40:1.2017[9]:
A. The OWCA recommends the following diagnostic procedures be considered, at least initially, the responsibility of the workers’ compensation carrier to ensure that an accurate diagnosis and treatment plan can be established. Standard procedures, that should be utilized when initially diagnosing a work-related low back pain complaint, are listed below. 1. History-taking and physical examination (Hx and PE) are generally accepted, well-established and widely used procedures that establish the foundation/basis for and dictates subsequent stages of diagnostic and therapeutic procedures. When findings of clinical evaluations and those of other diagnostic procedures are not complementing each other, the objective clinical findings should have preference. The medical records should reasonably document the following,
a. History of Present Injury — a detailed history, taken in temporal proximity to the time of injury should primarily guide | ^evaluation and treatment. The history should include pertinent positive and negative information regarding the following:
i. mechanism of injury. This includes details of symptom onset and progression. The mechanism of injury should include a detailed description of the incident and the position of the body before, during, and at the end of the incident. Inclusion of normal work body postures, frequency during the workday, and lifting/push/pull requirements should be included in the absence of a known specific incident;
ii. location of pain, nature of symptoms, and alleviating' exacerbating *743 factors (e.g., sitting tolerance). The history should include both the primary and secondary complaints (e.g., primary low back pain, secondary hip, groin). The use of a patient completed pain drawing, Visual Analog Scale (VAS), is highly recommended, especially during the first two weeks following injury to assure that all work related symptoms are addressed;
iii. presence and distribution of lower extremity numbness, paresthesias, or weakness, especially if precipitated by coughing or sneezing;
iv. alteration in bowel, bladder, or sexual function; and for female patients, alteration in their menstrual cycle;
v. prior occupational and non-occupational injuries to the same area including specific prior treatment, chronic or recurrent symptoms, and any functional limitations; Specific history regarding prior motor vehicle accidents may be helpful; and
vi. ability to perform job duties and activities of daily living.
The workers’ compensation provisions of the LAC set forth additional procedural directives to be followed by a claimant seeking authorization of medical treatment. An initial request for authorization of care by a health care provider on form LWC-WC-1010 is presented to the carrier/self-insured employer or a utilization review company, acting on behalf of the employer, to determine if the request for care is in accordance with the MTG. LAC 40:I.2715(B)(3)(d). In making this request, the health care provider is required to review the MTG for each area of the body to obtain specific services or diagnostic testing that is included in the request. LAC 40:1.2715(0(2). Based upon the medical information provided, the 11scarrier/self-insured employer determines if the request is in accordance with the MTG. LAC 40:I.2715(B)(3)(d).
Disputes are then filed by any aggrieved party for review by the Medical Director on form LWC-WC-1009. LAC 40:I.2715(B)(3)(e). Form LWC-WC-1010 and all of the information previously submitted to the carrier/self-insured employer are required to be submitted with the application. LAC 40:I.2715(J)(2)(b) and (c). In the case of a variance request, the health care provider or claimant shall provide any other evidence supporting the position of the health care provider, including scientific medical evidence demonstrating that a variance is reasonably required. LAC 40:I.2715(J)(2)(d). The carrier/self-insured employer also provides the Medical Director with any evidence it thinks pertinent to the decision. LAC 40:I.2715(J)(5)(a). The Medical Director renders a decision as to whether the request for authorization is medically necessary and in accordance with the MTG. LAC 40:I.2715(J)(5)(b).
Any party aggrieved by the decision of the Medical Director shall seek judicial review by filing Form LWC-WC-1008 in a workers’ compensation district office. LAC 40:I.2715(K)(1).
Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Silverman v. Weatherford Int’l, Inc., 46,402 (La.App.2d Cir.10/19/11), 83 So.3d 11, writ denied, 12-0076 (La.3/23/12), 85 So.3d 89. To reverse a factfinder’s determination under this standard of review, an |Happellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the *744 court must further determine the record establishes the finding is clearly wrong. Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993); Silverman, supra.
The “clear and convincing” standard in a workers’ compensation case is an intermediate standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard. Hatcherson v. Diebold, Inc., 00-3263 (La.5/15/01), 784 So.2d 1284; Hollingsworth v. Steven Garr Logging, 47,884 (La.App.2d Cir.2/27/13), 110 So.3d 1219. To prove a matter by “clear and convincing” evidence means to demonstrate that the existence of the disputed fact is highly probable or much more probable than its nonexistence. Hollingsworth, supra.

Discussion

Assignment of Error # 1: The WCJ committed legal, as well as manifest, error by according any weight to the Second Medical Opinion report of Dr. Donald Smith, which was not considered by the Medical Director in reaching his decision.
We have set forth extensively the various provisions of the new workers’ compensation legislation and the workers’ compensation portions of the LAC as guidance for answering Gilliam’s assignments of error. His first assignment of error raises the procedural question of the scope of the evidence that the WCJ may consider. Since Gilliam asserts that the WCJ cannot review new evidence not considered by the Medical Director, this | ^assignment of error also requires consideration of the evidence the Medical Director may receive in reaching his decision.
From our review of the new law and regulations, we find that the report or deposition of either the treating physician or the physician chosen by the employer’s carrier may be presented to the Medical Director. LAC 40:1.2711 gives the employer the option of obtaining a second medical opinion after surgery has been recommended by the treating physician. That occurred in this case in November 2012, when Dr. Smith reviewed Gilliam’s condition and records. In December 2012, Novare made its determination denying the request for surgery upon receipt of Dr. Smith’s narrative review and Dr. Ramos’s medical records. Thus, the opportunity to develop and perpetuate the opinion testimony of both physicians was within the power of employee and employer prior to submission to the Medical Director. LAC 40:I.2715(J) sets forth the procedure for the WC-1009 review process by the Medical Director. The medical information of both sides to the medical care dispute may be developed fully by any evidence the parties find pertinent to the decision, including scientific medical evidence demonstrating that a variance from the medical treatment schedule is reasonably required. LAC 40:I.2715(J).
Despite the leeway given by these new procedures, a full narrative of the medical opinion of Dr. Ramos or Dr. Smith was not made a part of the WC-1009 review in this case. Instead, the ruling of the Medical Director was reached upon the submission of Dr. Ramos’s medical records alone without the more thorough explanation he gave during his deposition of | lfiJuly 11, 2013. Likewise, Dr. Smith’s second opinion report was not reviewed by the Medical Director.
The narrative of Dr. Smith and the deposition of Dr. Ramos were presented as evidence in this dispute for the first time before the WCJ. From our review of the workers’ compensation law, including the new procedure for implementation of the MTG, we find appropriate the WCJ’s con *745 sideration of this additional evidence not received by the Medical Director.
Jurisdiction over workers’ compensation matters is conferred upon the Office of Workers’ Compensation Administration. LAC 40:1.5508. By this authority, the position of WCJ was created to replace district courts in the adjudication process of compensation claims. Wex S. Malone & H. Alston Johnson, III, Workers’ Compensation Law and Practice § 385, in 14 Louisiana Civil Law Treatise (5th Ed.2010); see also, La. Const. Art. V § 16(A)(1); La. R.S. 28:1310.1. The WCJ is given the authority to “hear the evidence that may be presented by each party.” La. R.S. 23:1317. Likewise, at the hearing, the WCJ is not bound by technical rules of evidence or procedure, “but all findings of fact must be based upon competent evidence.” Id. The hearing procedure also allows the parties to introduce the testimony of at least two physicians. La. R.S. 23:1124.1.
Both the office of workers’ compensation and the unemployment insurance administration are exempt from the Louisiana Administrative Procedure Act. La. R.S. 49:992. A comparison of the administrative procedure provided in Title 23 of the Revised Statutes for unemployment 117insurance claims shows that the receipt of evidence for such claims is limited by the legislature to the administrative hearings before the appeal referee and board of review. La. RS 23:1625.1; 23:1629; and 23:1630. La. R.S. 23:1634 then addresses the process for a limited judicial review of the claim by the district court. This statute specifically provides for appeal of the claim as follows in relevant part:
In any proceeding under this Section the findings of the board of review as to the facts, if supported by sufficient evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law. No additional evidence shall be received by the court, but the court may order additional evidence to be taken before the board of review, and the board of review may, after hearing such additional evidence, modify its findings and conclusions, together with a transcript of the additional record.
In contrast, we find no similar limitation by the legislature upon the WCJ’s power in the review of this matter. Therefore, the introduction of the disputed evidence before the WCJ was not error. This ruling is in keeping with this court’s recent decision in Daniels v. State through Dep’t of Transp. & Dev., 48,578 (La.App.2d Cir.6/25/14), 144 So.3d 1123.
Assignment of Error # 2: The WCJ committed legal, as well as manifest, error by concluding that Mr. Gilliam failed to prove by clear and convincing evidence that the Medical Director’s denial of the surgery recommended by Dr. Ramos was proper under the Medical Treatment Guidelines.
In his deposition, Dr. Ramos reviewed his treatment of Gilliam. He testified consistently with his medical records as set forth above. Additionally, he confirmed that he conducted a comprehensive neuro-musculoskeletal examination in accordance with the MTG, although he included only positive examination findings in his report. He found positive findings only on Gilliam’s right side. His physical exam (clinical |, ¡findings) showed manifestation of lumbosacral radiculopathy (disease of the spinal nerve roots and spinal nerves) at L3-4, L4-5 and L5-S1. Upon his review of the MRI, Dr. Ramos noted moderate loss of disc space at L4-5 and Ll-2 with mild to moderate degenerative narrowing and loss of signal at L2-3 and L3-4. At Ll-2, he saw moderate to large broad central disc herniation with annular tear and mod *746 erate compression of the thecal sac centrally. At L2-3, he saw moderate broad-based central disc bulge with annular tear at L3-4. At L4-5 he saw a small to moderate central disc left paracentral and mild impingement on the L5-S1 nerve root on the left.
Dr. Ramos explained that the MRI was his first indicator that something was wrong at Ll-2. He expressed concerns with this injury because of its location just in front of the spinal cord. Dr. Ramos testified that the annular tear was secondary to trauma in this case. He testified that the MRI showed central compression at all levels, including Ll-2, L2-3, L3-4, L4-5, which explained why Gilliam had right-sided symptomatology.
Dr. Ramos explained that the MTG lists as a surgical indication for a discectomy, primary radicular symptoms, which Gilliam exhibited. He also stated that in his medical opinion, the surgical indication correlated with the MRI.
Dr. Ramos reviewed the contrary findings of Dr. Smith, Ramos’s former medical partner of 17 years. Dr. Ramos agreed that a portion of the MRI findings indicated pre-existing degenerative changes. However, he further stated his disagreement with Dr. Smith’s conclusions as follows:
[E]ven if you assume that that is correct, the patient was not having manifestation of radiculopathy until he had the fall. So even [if] there |13are chronic changes, the fact that the central herniation at all those levels compromising both nerve roots indicates to me that’s too much to attribute to degenerative changes. Degenerative change area is usually localized in the areas that have more transitional movement. That sacrum is fixed. The lumbar spine is mobile and the transition in between is that one that’s submitted to more what we call mini trauma and that mini trauma over the years create changes.
He also explained that the MRI showed acute changes including the disc bulge, tear and annulus. Otherwise, Dr. Ramos concluded that Gilliam had a “normal spine for someone of his age.” He agreed that Gilliam’s degenerative changes were “enough to cause back pain in a lot of people, but that back pain is different from the back pain with radicular symptoms.” He also testified that the MRI study did not only indicate abnormalities on the left side. He explained that the MRI showed a broad-based central disc herniation which had compromised both the right and left sides at L1-L2 and a central disc bulge at L2-3, which could affect both nerve roots. The moderate left paracen-tral disc bulge at L3^t, L4-5 described a “small prominence toward the left, but the dis[c] is central and it’s broad based.”
Dr. Ramos testified that the MRI is “never useful in replacing the patient.” He explained that upon his initial physical examination of Gilliam, he did not identify problems at Ll-2 because “some of those levels are extremely difficult to identify on clinical grounds.” Dr. Ramos testified that he requested a certification for a minimally invasive right Ll-5 laminectomy and microdiscectomy. However, he stated that he would upgrade and would probably have to “go bilaterally, especially LI and 2.”
Even with Dr. Ramos’s more thorough discussion of his actions and opinion as the treating physician, we agree with the WCJ that the Medical | ^Director’s ruling was in accordance with MTG. The initial, recommended course of treatment by Dr. Ramos for physical therapy was not followed. This fact was noted in Dr. Smith’s report, which recommended rein *747 statement of some program of rehabilitation.
Dr. Smith also expressed his opinion that the suggested surgery would not permit Gilliam’s return to work activities requiring the lifting of greater than 100 pounds. Gilliam’s chronic degenerative disc disease was also emphasized. This brings to the fore the very large order imposed by the Guidelines upon proposals for back surgery, as follows:
Surgery should be contemplated within the context of expected functional outcome and not purely for the purpose of pain relief. The concept of “cure” with respect to surgical treatment by itself is generally a misnomer.
LAC 40:I.2015(A)(8).[10]
This Guidelines provision has not been addressed and challenged medically or legally by Gilliam in these proceedings.

Conclusion

For these reasons, we affirm the ruling of the WCJ. Gilliam did not meet his burden by clear and convincing evidence, showing that the Medical Director’s decision was a misapplication of the MTG. Costs of this appeal are assessed to Gilliam.
AFFIRMED.
BROWN, Chief Judge, dissents with written reasons.

. Medical Director is defined under La. R.S. 23:1203.1 as a physician who is licensed to practice medicine in the state of Louisiana and has been chosen by the director of the office of workers' compensation administration for settling disputes.

. On September 21, 2012, Dr. Ramos submitted a second request for authorization of the surgery. Novare denied the request on September 26, 2012. Gilliam dismissed an untimely appeal of the decision to the Medical Director without prejudice on July 2, 2013.

.The Louisiana Administrative Code (“LAC”) 40:1.2711 allows the employer to obtain a second professional opinion from a physician chosen by the employer.

. For purposes of this opinion, The Medical Treatment Schedule, referenced by La. R.S. 23:1203.1, will be referred to as the Medical Treatment Guidelines ("MTG”) as set forth in the Louisiana Workers' Compensation Administrative Code provisions. See LAC 40.T.2717.

. In its determination, Novare considered the MRI, second medical opinion of Dr. Donald Smith, previous forms filed and adverse determinations made, physical therapy evaluations and Dr. Ramos's medical records.

. These notes refer to the criteria applied by the Medical Director from the MTG, which are cited below. The spine MTG are included in Chapter 20, Subchapter B — Low Back Pain and include — General Guideline Principles, 2017 — Initial Diagnostic Procedures and 2023-Therapeutic Procedures — Operative.

. These sections address medical care, services, and treatment that varies from or are not specified in the MTG and allow payment for these amounts when it is demonstrated to the medical director, that a preponderance of the scientific medical evidence supports approval of the treatment that varies or is not covered.

. In June 2014, LAC 40:I:2023(F)(1) and (3), cited above, were redesignated as 40:I:2023(G)(1) and (3).

. As of June 2014, LAC 40:I.2017(A)(l)(a)(v) now reads: v. any treatment for current injuries or results.

. In June of 2014, after the Medical Director’s ruling, the following language was added to LAC 40:I.2015(A)8: "The decision and recommendation for operative treatment, and the appropriate informed consent should be made by the operating surgeon. Prior to surgical intervention, the patient and treating physician should identify functional operative goals and the likelihood of achieving improved ability to perform activities of daily living or work activities and the patient should agree to comply with the pre- and post-operative treatment plan and home exercise requirements. The patient should understand the length of partial and full disability expected post-operatively.” Since this addition to the MTG might change the medical evaluation of a proposal for surgery for Gilliam, he will not be prevented from presenting a new request in the future for surgery.