BROWN, C.J.
hThis is a workers’ compensation ease. Claimant, Hurchel Kendrick,[1] started receiving indemnity benefits and necessary medical treatment after he injured his back and right knee on the job. Thereafter, the physician treating claimant for his back-related complaints requested authorization for a CT myelogram with 3-D reconstruction. The request was denied by Amerisure Insurance Company, the workers’ compensation provider for claimant’s employer, Hercules Concrete Pumping Service, Inc., and thereafter by the Workers’ Compensation Administration’s medical director. Claimant appealed to the WCJ, which, after a hearing, affirmed the decision of the Medical Director. We reverse and remand.
FACTS
On January 28, 2015, Hurchel Kendrick was working for Hercules Concrete when he fell from his work truck. Kendrick alleged injuries to his back and right knee, and his claim was accepted as compensable by defendant, Hercules Concrete, and its workers’ compensation carrier, Amerisure Insurance Company.[2] Thereafter, Kendrick began receiving indemnity benefits and necessary medical treatment.
On May 4, 2015, a lumbar MRI was performed due to claimant’s complaint of lower back pain. On May 29, 2015, Dr. Douglas Brown performed a total knee replacement surgery on Kendrick’s right knee. ^Subsequently, Kendrick began treating with Dr. Bernie McHugh for his low back pain.
On September 25, 2015, Dr. McHugh sent a Form 1010 to Amerisure requesting authorization for a CT myelogram with 3-D reconstruction. On October 12, 2015, UniMed Direct, on behalf of Amerisure, determined that the recommended testing was not “medically necessary” under the Medical Treatment Guidelines (hereafter referred to as the “MTG”), and the request for authorization was denied. On October 22, 2015, Kendrick appealed this denial to the medical director.[3]
On February 16, 2016, the Medical Director issued his decision. The Medical Director applied “Chapter 20, Spine Medical Treatment Guidelines, Subchapter B, Low Back Pain, subsection C” of the MTG and concluded the following:
The MTG states that the myelogram should only be used when CT and MRI is not available. In this instance an MRI has already been performed. Therefore the MTG does not support the CT mye-logram with 3d reconstruction. Although the Medical Treatment Guidelines recognize that clinical situations sometimes require a variance from guidelines, no information was provid *258 ed to support a variance. (Emphasis added).
On February 26, 2016, Kendrick filed a Form 1008 and a motion to appeal the medical director’s decision. The WCJ heard the matter on April 26, 2016. Claimant testified and introduced his medical records into evidence. Claimant stated the following:
My back, primarily I have low back pain. I have pain stimulating down my left leg, through my hip. My right leg bothers me some, but it’s mostly down my left leg. I have muscle cramps, what feels like shin splints sometimes and I|3 have a tingling sensation. It feels like insects crawling around my ankles. I have fairly ongoing pain in my testicles because of the injury.
Claimant’s medical records included a document produced by Dr. McHugh, which contained the following information:
An MRI of the lumbar spine demonstrates diffuse degenerative disc change. There is a grade-1 spondylolisthesis at L4/L5 with stenosis. There is also a right paracentral disc herniation with stenosis at L5/S1.
1. A 55-year-old male with low back pain, lower extremity pain, numbness, and tingling, left greater than right.
2. Neurogenic claudication-type symptoms.
3. Lower extremity symptoms beginning following a work-related injury in January 2015.
4. Right knee pain status post a right knee surgery on 05-29-15
I [Dr. McHugh] reviewed the MRI with Mr. Kendrick. Because his symptoms have not responded to conservative treatment, we will send him for a CT myelogram of the lumbar spine with 3D reconstructions and have him return to discuss recommendations for surgery. We recommend that the patient continue off work at this time.
At the conclusion of the trial, the WCJ affirmed the decision of the medical director. The WCJ determined that, based on the evidence, Kendrick failed to satisfy the requirements for the recommended testing to be considered medically necessary.
Claimant has appealed from this judgment.
DISCUSSION
The issue before us is whether the WCJ correctly affirmed the decision of the medical director denying Kendrick’s request for a CT myelogram with 3-D reconstruction.
A workers’ compensation claimant may recover medical treatment that is reasonably necessary for the treatment of a medical condition caused |4by a work injury. La. R.S. 23:1203(A); Church Mutual Insurance Co. v. Dardar, 13-2351 (La. 05/07/14), 145 So.3d 271. Medical necessity includes services that are in accordance with the MTG and are clinically appropriate and effective for the patient’s illness, injury or disease. LAC 40:1.2717; Gilliam v. Brooks Heating & Air Conditioning, 49,161 (La.App. 2 Cir. 07/16/14), 146 So.3d 734. To be medically necessary, a service must be consistent with the diagnosis and treatment of a condition or complaint, in accordance with the MTG, not solely for the convenience of the patient, family, hospital or physician and furnished in the most appropriate and least intensive type of medical care setting required by the patient’s condition. Gilliam, supra.
An initial request for authorization of care by a health care provider on Form 1010 is presented to the carrier/self-insured employer or a utilization review company, acting on behalf of the employer, to determine if the request for care is in *259 accordance with the MTG. LAC 40:I.2715(B)(3)(d). In responding to this request, the health care provider is required to review the MTG for each area of the body to obtain specific services or diagnostic testing that is included in the request. LAC 40:I.2715(C)(2). Based upon the medical information provided, the carrier/self-insured employer determines if the request is in accordance with the MTG. LAC 40:I.2715(B)(3)(d).
Disputes are then filed by any aggrieved party for review by the medical director on Forml009. LAC 40:I.2715(B)(3)(e). FormlOlO and all of the information previously submitted to the carrier/self-insured employer are required to be submitted with the application. LAC 40:I.2715(J)(2)(b) and (c). The carrier/self-insured employer also provides the medical director [ ¿with any evidence it thinks pertinent to the decision. LAC 40:I.2715(J)(5)(a). The medical director renders a decision as to whether the request for authorization is medically necessary and in accordance with the MTG. LAC 40:I.2715(J)(5)(b).
Any party aggrieved by the decision of the Medical Director shall seek judicial review by filing Form 1008 in a workers’ compensation district office. LAC 40:I.2715(K)(1). The decision of the medical director may only be overturned when it is shown, by clear and convincing evidence that the decision was not in accordance with the provisions of R.S. 23:1203.1. Id.
The “clear and convincing” standard in a workers’ compensation case is an intermediate standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard. Hatcherson v. Diebold, Inc., 00-3263 (La. 05/15/01), 784 So.2d 1284; Gilliam, supra. To prove a matter by “clear and convincing” evidence means to demonstrate that the existence of the disputed fact is highly probable or much more probable than its nonexistence. Gilliam, supra.
A “CT myelogram” is not a clearly defined term in the MTG. Instead, it is referenced in several provisions of the MTG. A review of these pertinent provisions provides a definition and its applicability.
The first sentence of Chapter 20 Sub-chapter (B), Subsection (C) states that “Magnetic resonance imaging (MRI), mye-lography, or computed axial tomography (CT) scanning following myelography, and other imaging procedures and testing may provide useful information for many spinal | (¡disorders.” Chapter 20, Subchapter (B), Subsection (C)(1)(b) defines “CT” as follows:
Computed Axial Tomography (CT) provides excellent visualization of bone and is used to further evaluate bony masses and suspected fractures not clearly identified on radiographic evaluation. It may sometimes be done as a complement to MRI scanning to better delineate bony osteophyte formation in the neural fora-men. Instrument-scatter reduction software provides better resolution when metallic artifact is of concern.
Chapter 20, Subchapter (B), Subsection (C)(1)(c), the provision relied upon by the Medical Director, defines “myelography” as follows:
Myelography is the injection of radio-paque material into the spinal subarach-noid space, with x-rays then taken to define anatomy. It may be used as a diagnostic procedure to obtain accurate information of characteristics, location, and spatial relationships among soft tissue and bony structures. Myelography is an invasive procedure with complications including nausea, vomiting, headache, convulsion, arachnoiditis, cerebral-spinal fluid (CSF) leakage, allergic reactions, *260 bleeding, and infection. Therefore, mye-lography should only be considered when CT and MRI are unavailable, for morbidly obese patients or those who have undergone multiple operations, and when other tests prove non-diagnostic. The use of small needles and a less toxic, water-soluble, noniónic contrast is recommended.
Chapter 20, Subehapter(B), Subsection (C)(1)(d) of the MTG, states that “CT My-elogram provides more detailed information about relationships between neural elements and surrounding anatomy and is appropriate in patients with multiple prior operations or tumorous conditions.”
These provisions provide that a CT My-elogram is merely a CT scan with a myelo-gram. Moreover, these provisions provide that a myelogram should only be used when CT and MRI are not available, for morbidly obese patients, for those who have undergone multiple operations, or when other tests prove to be non-diagnostic. In this case, Kendrick testified that an MRI of his lower back had already been done, that he had not undergone prior [^surgery on his back, and that he is not morbidly obese. Thus, he does not satisfy any of these requirements. Furthermore, claimant did not produce any evidence showing that he was suffering from a tumorous condition. This finding notwithstanding, based on our review, we find that a variance from the MTG may be appropriate.
Medical care, services and treatment that varies from the promulgated MTG shall also be due by the employer when it is. demonstrated to the medical director of the office by a preponderance of the scientific medical evidence, that a variance from the MTG is reasonably required to cure or relieve the injured worker from the effects of the injury or occupational disease given the circumstances. La. R.S. 23:1203.1(1). In the case of a variance request, the claimant shall state the reason for review by the medical director is that a variance from the MTG is warranted and the health care provider or claimant shall provide any other evidence supporting the position of the health care provider, including scientific medical evidence demonstrating that a variance is reasonably required. LAC 40:I.2715(J)(2). One of the situations in which a variance exists , is when the requested care, services, or treatment is not recommended by the MTG although the diagnosis is covered. LAC 40:I.2715(L)(2)(a).
As we have already concluded, Kendrick does not fit squarely into the guidelines of the MTG. However, the latter provisions acknowledge that in some cases, a variance from the MTG is necessary. Here, based on the testimony of Kendrick, with supporting medical records, there is no disputing that he suffers from serious low back pain as a result of his work injury. Dr. McHugh requested the CT myelogram with 3-D reconstruction in advance of surgery. Plainly, Dr. McHugh requested the CT myelogram |sbecause he thought it was best for his patient, Kendrick. The latter, combined with scientific medical evidence showing a variance is necessary, may have convinced the medical director and the WCJ to approve claimant’s request. The difficulty before us on appeal, as expressed by the medical director, is that claimant did not submit a request for a variance from the MTG, together with supporting scientific medical evidence, from the medical director or the WCJ, which is required by the MTG. Even on appeal, claimant has not argued for a variance from the MTG. However, La. C.C.P. Art. 2164 provides that the appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. See also Vallo v. Gayle Oil Company, Inc., 94-1238 (La. *261 11/30/94), 646 So.2d 859. We find this principle to be applicable to the matter before us.
Accordingly, we remand the case to the WCJ to give claimant the opportunity to present scientific medical evidence as to why a variance from the MTG is necessary.
CONCLUSION
The ruling of the WCJ is REVERSED AND REMANDED for further proceedings consistent with this opinion. Costs of this appeal are assessed against defendant, Hercules Concrete Pumping Service, Inc.

. Although the record was lodged with claimant's first name spelled as "Hurshel" and it is spelled in the record in several other places as "Hurschel,” we will use "Hurchel” throughout this opinion as this is the correct spelling of claimant's first name.

. Kendrick also filed a civil action against Hercules Concrete alleging wrongful discharge, which is also on appeal with this Court. See No. 51,190-CA. These cases have not been consolidated.

.Under La. R.S. 23:1203.1, the medical director is a physician who is licensed to practice medicine in the State of Louisiana and has been chosen by the director of the Office of Workers’ Compensation Administration for settling disputes.