PITMAN, J.
| plaintiff Cecilia Sanchez appeals the judgment of the Workers’ Compensation Judge (“WCJ”) in favor of Defendant Caesar’s Entertainment, Inc. (“Caesar’s”), and Caesar’s appeals the WCJ’s judgment in favor of Ms. Sanchez. For the following reasons, we affirm.

FACTS

In 1995, Ms. Sanchez began working as a card dealer at the Horseshoe Casino, which is owned by Caesar’s. On November 26, 2011, Ms. Sanchez injured her back and hip when she slipped and fell on a metal ramp at the casino. Caesar’s paid indemnity benefits from May 15, 2013, through October 16, 2013.
On September 10, 2013, Ms. Sanchez filed a Forml008 (disputed claim for compensation) seeking indemnity benefits, all reasonable and necessary medical treatment, penalties and attorney fees.
On October 4, 2013, Ms. Sanchez filed a motion to oppose an independent medical examination (“IME”). She explained that Caesar’s filed a request for an IME with the medical director of the Office of Workers’ Compensation Administration and that the medical director set an IME with Dr. Robert Holladay. Ms. Sanchez contended that there is no true dispute between the physician of her choice and Caesar’s choice of physician.[1] She requested that the WCJ find that no IME was needed, or in the alternative, appoint a physician who is fellowship trained in spine Rsurgery and actively treats spine patients, qualifications that Dr. Holladay lacks.
On October 8, 2013, Caesar’s filed a memorandum in support of an IME and contended that the WCJ should not overturn an IME simply because one party does not like the selected physician. It stated that there is a dispute as to Ms. Sanchez’s ability to work and averred that to deny or modify an IME would allow for an unjustified manipulation of the system.
On October 8, 2013, Caesar’s filed an answer. It denied that Ms. Sanchez was temporarily or permanently disabled, denied that she sustained any loss of wage-earning capacity, asserted a credit for any wages earned or capable of being earned by Ms. Sanchez and asserted all rights to deny or limit their liability for payments for medical expenses.[2]
On Noyember 18, 2013, Ms. Sanchez filed a first amended disputed claim for compensation (1008). She stated that her benefits were terminated or' reduced on October 17, 2013, and that she is entitled to indemnity benefits, all reasonable and necessary medical treatment, penalties and attorney fees.
On December 2, 2013, Caesar’s filed an answer to the first amended disputed claim *1286 for compensation. It incorporated all answers and defenses set forth in the original answer and requested that Ms. Sanchez’s claims be dismissed with prejudice.[3]
|SA trial on the merits began on June 3, 2014. The WCJ noted that the facts that Ms. Sanchez was employed by Caesar’s and that she was in an accident on November 26, 2011, are not disputed. The WCJ stated that the issues for trial were whether Ms. Sanchez is entitled to indemnity benefits after October 17, 2013, and whether she is entitled to lumbar epiclural steroid injections (“LESI”).[4]
Ms. Sanchez testified that she began working as a card dealer at the Horseshoe Casino in 1995 and stopped working there in 2013. She stated that, on November 26, 2011, she slipped and fell while at work and hurt her back. She immediately reported the accident. She further testified that a few days after the accident, she visited her family doctor, who advised her to seek workers’ compensation. She continued to work at the casino, but the constant pain from her injuries affected her ability to work. She noted that, at the time of trial, she still was experiencing lower back pain and, periodically, pain in her left leg. She stated that - sometimes she could not finish a shift at work because of her pain and that other times she could not go to work. She also stated that she took a lot of medication, including Trama-dol. She testified that she saw Dr. John Mays about her injuries and that, in the summer of 2012, he took her off work for two weeks, during which time she received workers’ compensation benefits. Ms. Sanchez stated that she had an MRI during these two weeks, and then was released by Dr. Mays to return to work. She testified that she continued to work until May 2013 when she saw Dr. Milan Mody, who placed her on some |4work restrictions. She further testified that she received workers’ compensation benefits from May 2013 until October 2013, but that her benefits stopped after she saw Dr. Holladay for the IME. Ms. Sanchez stated that, since her benefits stopped, she has not worked anywhere and felt she was unable to work because of pain in her leg and hip. She also testified that Dr. Mody recommended injections for her back, but that they were not approved by the medical director. Ms. Sanchez stated that she also suffered neck and back injuries in a 1999 car accident, but received treatment, after which the problems resolved and she was able to return to work. She further stated that three to four years before the accident at the casino, she was treated for bone density issues and that she has osteopenia.[5]
On cross-examination, Ms. Sanchez stated that, when she fell at the casino, she *1287 immediately felt pain in her hip and back. She continued to work, however, and received injections in her back for the pain and participated in physical therapy. She further stated that, in June 2012, she returned to Dr. Mays because she was unable to complete a full work shift. He gave her an injection and sent her home for two weeks. She testified that, during those two weeks, she also had an MRI of her lower back, and it was determined that she had a very mild lumbar spondylosis. She stated |athat she returned to work in July 2012.[6] She again saw Dr. Mays in September 2012, and he approved her to continue on full duty at work. She testified that, in March 2013, she inquired with Employee Relations at the casino about work restrictions regarding how long she could sit, but Employee Relations advised her that she could not have work restrictions. Ms. Sanchez further testified that she saw Dr. Mays again in April 2013, whereupon he noted that he did not have an explanation for her discomfort and did not believe there was a need to restrict her at work. She stated that she then retained counsel and began to see Dr. Mody, who gave her restrictions for light duty, which allowed her to alternate between sitting and standing every 30 minutes.[7] She also stated that, after she received the restrictions from Dr. Mody, Caesar’s requested that she undergo an IME to resolve the dispute between Dr. Mays and Dr. Mody regarding the work restrictions. She saw Dr. Holladay on October 15, 2013, and her benefits were terminated when Dr. Holladay’s report was issued.
The WCJ also questioned Ms. Sanchez. She testified that she tried to work as much as possible and took medication every four to five hours so that she could work. She stated that she missed work about once a week; and, two or three times a week, she left in the middle of her shifts due to pain. She testified that, since the accident, her pain has remained the same.
| fiBoth parties introduced into evidence depositions, extensive medical records and other exhibits.[8]
In his deposition, Dr. Mays testified that he is board certified in orthopedic surgery. He stated that he first saw Ms. Sanchez on February 20, 2012, regarding her November 2011 fall at work. He conducted an orthopedic evaluation of Ms. Sanchez and noted that she had no objective findings. He also noted that she complained of ten *1288 derness and pain in her low back, lumbar spine area and that he diagnosed her with a lumbar strain. He stated that he continued her on full-duty status at work and prescribed Tramadol for pain management. Dr. Mays further stated that he next saw Ms. Sanchez on April 30, 2012, and that there was no significant change in her condition from her previous visit. He recommended that she participate in physical therapy. Dr. Mays testified that he next saw Ms. Sanchez on June 4, 2012, and that she reported she had completed physical therapy and was doing an at-home exercise program. He stated that her pain had also improved from a trigger point injection she received at her previous visit. Following the June 4, 2012 visit, he released Ms. Sanchez to come back on an as-needed basis. Dr. Mays stated that Ms. Sanchez returned two weeks later complaining of a change in her symptoms, i.e., pain in her left lower 17back that radiated up to her shoulder blades and down into her thigh and leg. He noted that she continued to work, but said she was unable to stand for more than four hours before the pain became unbearable. He testified that her radicular symptoms necessitated an MRI for further evaluation and removed her from work for two weeks as a precaution based on her complained-of symptoms. Dr. Mays further testified that he and a radiologist reviewed the MRI film and noted a very mild lumbar spondylosis, but that the film was otherwise unremarkable. He stated that this finding is normal for a person of Ms. Sanchez’s age. He returned Ms. Sanchez to full-duty status following her two weeks off work. He stated that her next visit was on September 19, 2012, and that she continued to complain of pain in her lower back that radiated to her left buttock and thigh. At her December 21, 2012 visit, she had a normal exam of her lumbar spine and both hips. Dr. Mays recommended that she continue her home exercise and stretching program and told her that he would not recommend surgical intervention. He testified that he next saw Ms. Sanchez on April 3, 2013, and she claimed she was having difficulty sitting for long periods of time at work. He stated that he did not give her work restrictions based upon this complaint. Ms. Sanchez did not return to his office after the April 2013 appointment. Dr. Mays also testified that he did not recommend an epidural steroid injection for Ms. Sanchez because he did not believe it was medically necessary.
In his deposition, Dr. Holladay testified that he specializes in orthopedic surgery and acted as an independent medical examiner in this |8case at the request of the state. He stated that he conducted an IME of Ms. Sanchez on October 15, 2013, noting that she complained of lower back pain, pain in her left buttocks and occasional pain on the back of her left thigh. He testified that Ms. Sanchez’s physical examination was “totally normal,” and she demonstrated a full range of motion in her lower back. He further testified that nothing in his examination supports that Ms. Sanchez should have work restrictions. Dr. Holladay stated that, as part of his examination, he reviewed Ms. Sanchez’s medical history, including the records of Dr. Mays and Dr. Mody. He testified that Dr. Mody’s finding of an annulus tear is a misnomer and explained that the annulus degenerates with age and is not the result of a traumatic event. He further testified that he saw no justification for injections in her back, noting that, although medical literature suggests that injections may temporarily reduce the pain of a person within the first six weeks of an accident, there is no literature that supports injec *1289 tions for a person who has symptoms several years post-accident.
In his deposition, Dr. Mody testified that he is board certified in spine surgery and completed a spine surgery fellowship. He stated that he first saw Ms. Sanchez on May 15, 2013, in regard to continuing back and leg pain resulting from her fall in November 2011. He noted that he reviewed a lumbar MRI that was performed on July 10, 2012, and determined that it showed very mild lumbar spondylosis and an annulus tear at L5-S1. Dr. Mody testified that he also conducted a physical examination of Ms. Sanchez and noted that she had a painful gait on her left side and had ajj¡mild limitation in her range of motion. He stated that he recommended anti-inflammatory pain cream and LESIs. He determined that Ms. Sanchez could work with limitations, i.e., alternating between standing and sitting every 30 minutes. Dr. Mody testified that he next saw Ms. Sanchez on June 20, 2013, and diagnosed her with lumbago, i.e., back pain, and radiculopathy resulting from leg pain. He noted that, at this time, she was released to work full-time, but with modified duty as tolerated, which was a continuation of the restriction he gave her the previous month. He stated that Ms. Sanchez managed her pain by taking Tramadol and using pain cream because the injections had not been approved. Dr. Mody also stated that he next saw Ms. Sanchez on August 22, 2013, and noted that her diagnosis remained the same and she continued to complain of lower back, left leg and left hip pain. He testified that he again recommended lumbar injections and that, if she had no relief, he would refer her back to Dr. Mays for her hip pain and would recommend work hardening and a functional capacity evaluation. At this time, Dr. Mody determined that Ms. Sanchez should temporarily not return to work. He testified that he next saw Ms. Sanchez on October 23, 2013, and her diagnosis had not changed, but physical therapy had helped her leg pain since her previous visit. He stated that he last saw Ms. Sanchez on January 30, 2014, and maintained her diagnosis. Dr. Mody also discussed why he recommended LESIs for Ms. Sanchez. He testified that she is a reliable patient who showed some improvement after therapy and home exercises. He noted that the injections are for the purpose of pain management and tend to help patients after two |inor three injections. He stated that, if the injections did not help alleviate Ms. Sanchez’s pain, the next step would be to consider surgical intervention. He noted that the medical director denied the request for LESIs.
On July 28, 2014, the WCJ signed a judgment in favor of Ms. Sanchez, reversing the medical director’s denial of the LESI therapy recommended by Dr. Mody and ordering Caesar’s to approve and pay for an initial LESI, and in favor of Caesar’s, dismissing Ms. Sanchez’s demand for additional indemnity benefits, penalties and attorney fees. The WCJ also filed detailed reasons for judgment.
Ms. Sanchez appeals. Caesar’s answers the appeal, seeking review of the WCJ’s ruling on the LESI issue.

ARGUMENT

Determination of Injury to Ms. Sanchez’s Back

In her first assignment of error, Ms. Sanchez argues that the WCJ did not decide whether she has a torn disc in her back. She requests that this court exercise de novo review and determine that she has a torn annulus in her disc at the L5-S1 *1290 level. She argues that whether she has a torn disc in her back is the main issue in the case and that her entitlement to injections and indemnity benefits flows from this determination.
In determining whether Ms. Sanchez is entitled to indemnity benefits and LESIs, the WCJ need not make a factual finding as to a specific injury suffered by Ms. Sanchez. Regarding temporary total disability benefits, the relevant inquiry was whether Ms. Sanchez proved by clear and convincing Inevidence that she is physically unable to engage in any employment. Regarding supplemental earnings benefits, the relevant inquiry was whether Ms. Sanchez proved by clear and convincing evidence that, solely as a consequence of substantial pain, she cannot perform employment available to her. Regarding LESIs, the relevant inquiry was whether Ms. Sanchez proved by clear and convincing evidence that the medical director was not in accordance with the Medical Treatment Guidelines. In reaching its judgments, the WCJ noted Ms. Sanchez’s pain, but also acknowledged disputes among her physicians as to “particular pathology.” None of the inquiries necessitated a factual finding by the WCJ that Ms. Sanchez has a torn disc in her back.
Furthermore, as a finding that Ms. Sanchez has a torn annulus in her disc at the L5-S1 level is not necessary for the review of the WCJ’s judgments, this court will not make such a factual finding on appeal.
Accordingly, this assignment of error lacks merit.

Denial of Claim for Indemnity Benefits

In her second assignment of error, Ms. Sanchez argues that the WCJ erred by denying her claim for indemnity benefits. She contends that, because Dr. Mody completely restricted her from work on August 22, 2013, she is entitled to receive bi-weekly temporary total disability benefits in the amount of $1,184 from October 16, 2013, or in the alternative, monthly supplemental earning benefits in the amount of $2,565.34.
Caesar’s argues that the WCJ was correct in reaching the decision that Ms. Sanchez failed to carry her burden of proof of entitlement to |12benefits. Caesar’s contends that the opinions of Drs. Holladay and Mays and Ms. Sanchez’s post-accident work activities all demonstrate that a reasonable trier of fact could have concluded, as the WCJ did, that Ms. Sanchez failed to prove her disability.
A workers’ compensation claimant seeking temporary total disability benefits bears the burden of proving by clear and convincing evidence that he or she is physically unable to engage in any employment. La. R.S. 23:1221(l)(c). A workers’ compensation claimant seeking supplemental earnings benefits bears the burden of proving by clear and convincing evidence that solely as a consequence of substantial pain, he or she cannot perform employment offered, tendered or otherwise proven to be available to him or her. La. R.S. 23:1221(3) (c) (ii). Whether the claimant has carried his or her burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Morgan v. Glazers Wholesale Drug Co., 46,692 (La.App.2d Cir.11/2/11), 79 So.3d 417.
Factual findings in workers’ compensation cases are subject to the manifest error rule. Buxton v. Iowa Police Dep’t, 09-0520 (La.10/20/09), 23 So.3d 275; Morgan v. Glazers Wholesale Drug Co., supra. Under the manifest error rule, a reviewing *1291 court does not decide whether the fact finder was right or wrong, but only whether its findings are reasonable. Buxton v. Iowa Police Dep’t, supra; Morgan v. Glazers Wholesale Drug Co., supra.
In its analysis of Ms. Sanchez’s entitlement to temporary total disability benefits, the WCJ noted that Ms. Sanchez’s initial physician, | lsDr. Mays, found no basis to restrict her work activity. The WCJ pointed out that Ms. Sanchez continued to work at the casino for 18 months after the accident until she began to see Dr. Mody in May 2018. The WCJ noted that Dr. Mody initially determined that Ms. Sanchez could work with restrictions but then deemed her unable to work. The WCJ stated that Ms. Sanchez did not present any evidence of a significant change in her circumstances from when she met with Dr. Mays, when she met with Dr. Mody and when Dr. Mody deemed her unable to work. The WCJ found that, even though Ms. Sanchez testified that she repeatedly left work early or was unable to come into work because of pain, she offered no evidence to support these claims, e.g., attendance records. The WCJ determined that Ms. Sanchez did not present any evidence at trial that she was incapable of performing the light duties of a card dealer at a casino. We find that the WCJ was not manifestly erroneous in finding that Ms. Sanchez did not meet her burden of proving by clear and convincing evidence that she is physically unable to engage in any employment. The evidence clearly demonstrates that she was able to perform her job as a card dealer for over a year after her fall. She offered no documentation that her attendance at work suffered as a result of her injury.
In its analysis of Ms. Sanchez’s entitlement to supplemental earning benefits, the WCJ discussed the opinions of the physicians who examined Ms. Sanchez. The WCJ noted that Dr. Mays found no basis to restrict Ms. Sanchez from work, and the WCJ assigned “substantial weight”, to Dr. Mays’s opinion because he served as Ms. Sanchez’s treating physician 114for over a year following her accident. The WCJ stated that Ms. Sanchez’s ability to continue performing her regular work duties until she met with Dr. Mody in May 2013 supports Dr. Mays’s opinion. The WCJ also considered Dr. Mody’s opinion that Ms. Sanchez is unable to work and at least needs work restrictions,[9] noting that “the evidence of claimant’s alleged disability is at best, evenly balanced,” which is insufficient to carry her burden of proof. See Johnson v. T & J Hauling Co., 46,858 (La.App.2d Cir.1/25/12), 86 So.3d 1, writ denied, 12-0657 (La.4/20/12), 85 So.3d 1276 (“If the evidence is evenly balanced or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the plaintiff fails to carry the burden of proof.”). We find that the WCJ was not manifestly erroneous in finding that Ms. Sanchez did not meet her burden of proving by clear and convincing evidence that, solely as a consequence of substantial pain, she cannot perform employment offered, tendered or otherwise proven to be available to her. As dis *1292 cussed supra, Ms. Sanchez failed to offer evidence such as time sheets to corroborate her contention that she was unable to work a complete shift and that she often missed work due to pain.
Accordingly, this assignment of error lacks merit.

h¿Necessity of Lumbar Epidural Steroid Injection

In its sole assignment of error, Caesar’s argues that the WCJ manifestly erred in ruling that clear and convincing evidence supported overturning the medical director’s denial of the LESI. Caesar’s contends that the only evidence in favor of the necessity of the LESI is from Dr. Mody, who became involved after Ms. Sanchez hired an attorney. It alleges that all other evidence, including the opinions of Drs. Mays and Holladay, is strongly against the medical necessity of an LESI. It contends that the WCJ came to his finding based on the provisions of the Medical Treatment Guidelines that focus on whether a plaintiff has radiographic evidence to support the injection. Caesar’s argues that the evidence is not clear and convincing as to whether Ms. Sanchez has an annulus tear that necessitates an LESI.
Ms. Sanchez states that the WCJ found that she proved by clear and convincing evidence that she is entitled to the LESI. She notes that the WCJ credited Dr. Mody over Dr. Mays and gave no weight to Dr. Holladay when awarding the injection. She also contends that the medical director’s denial was contrary to the Medical Treatment Guidelines.
La. R.S. 23:1203.1(K) states:
After the issuance of the decision by the medical director or associate medical director of the office, any party who disagrees with the decision, may then appeal by filing a “Disputed Claim for Compensation”, which is LWC Form 1008. The decision may be overturned when it is shown, by clear and convincing evidence, the decision of the medical director or associate medical director was not in accordance with the provisions of this Section.
In Gilliam v. Brooks Heating & Air Conditioning, 49,161 (La.App.2d Cir.7/16/14), 146 So.3d 734, this court discussed La. R.S. 23:1203.1 and the Medical Treatment Guidelines and stated:
A workers’ compensation claimant may recover medical treatment that is reasonably necessary for the treatment of a medical condition caused by a work injury. La. R.S. 23:1203(A); Church Mut. Ins. Co. v. Dardar, 13-2351 (La.5/7/14), 145 So.3d 271. Enacted by the legislature in 2009, La. R.S. 23:1203.1 is the product of a combined endeavor by employers, insurers, labor, and medical providers to establish meaningful guidelines for the treatment of injured workers. La. R.S. 23:1203(A); Church, supra. La. R.S. 23:1203.1 was enacted with the express intent that, with the establishment and enforcement of the medical treatment schedule, medical and surgical treatment, hospital care, and other health care provider services shall be delivered in an efficient and timely manner to injured employees. La. R.S. 23:1203.1(L).
Medical necessity includes services that are in accordance with the MTG and are clinically appropriate and effective for the patient’s illness, injury or disease. LAC 40:1.2717. To be medically necessary, a service must be consistent with the diagnosis and treatment of a condi *1293 tion or complaint, in accordance with the MTG, not solely for the convenience of the patient, family, hospital or physician and furnished in the most appropriate and least intensive type of medical care setting required by the patient’s condition. Id.
* * ⅜
Under the new law, a claimant seeking judicial review of the Medical Director’s decision must prove the necessity of the sought-after medical treatment by clear and convincing evidence. Id. However, under La. R.S. 23:1203.1(1) and (M)(2), the claimant’s initial burden before the Medical Director remains one of proof by a preponderance of the evidence. Id.
In the case sub judice, the medical director determined that LESIs were not medically necessary. The WCJ examined the subsection of the [ 17Medical Treatment Guidelines concerning Chronic Pain Disorders and noted that Sections 2109[10] and 2111[11] “reflect that the injections proposed Jisby Dr. Mody are accepted and well- *1294 established procedures. They are indicated when more conservative treatment has failed, and clinical exams along with imaging studies suggest likely disc pathology.” The WCJ also discussed Ms. Sanchez’s continuing pain and determined that she proved by clear and convincing evidence that the medical director’s denial of the LESI treatment is contrary to the Medical Treatment Guidelines. We find that the 119WCJ was not manifestly erroneous in finding that Ms. Sanchez met her burden. She repeatedly complained of pain to her physicians, and the Medical Treatment Guidelines provide for LESIs as a treatment option for chronic pain.
Accordingly, this assignment of error lacks merit.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the Workers’ Compensation Judge in favor of Defendant Caesar’s Entertainment, Inc., that Plaintiff' Cecilia Sanchez is not entitled to indemnity benefits. We further affirm the judgment of the Workers’ Compensation Judge in favor of Plaintiff Cecilia Sanchez that she is entitled to a lumbar epidural steroid injection. Costs of appeal are assessed equally to both parties.
AFFIRMED.

. Ms. Sanchez explained that she was being treated by Dr. Milan Mody, who "took her off of work temporarily and recommended work hardening, followed by an FCE and voc rehab.” Ms. Sanchez explained that she was previously treated by Dr. John Mays, who opined that she would eventually be able to return to work and that her pain would gradually resolve over time. She noted that Dr. Mays did not give her a full duty release and restricted her from strenuous activities at work. Therefore, Ms. Sanchez contended that there is no true dispute between the physicians on work status.

. In the alternative, Caesar’s contended that its liability is limited to the amounts allowed under the Utilization Review guidelines and the reimbursement schedule. It also asserted rights to reduction of benefits and to reimbursement, offset and/or credit for overpaid benefits.

. In the alternative, Caesar's requested all offsets and credits to which it is entitled under law.

. The WCJ also noted issues regarding her average weekly wage and that she claimed penalties and attorney fees.

. On cross-examination, Ms. Sanchez was questioned further about her medical history. Regarding injuries suffered in the 1999 car accident, she stated that she was only treated for neck pain. She explained that she had a bone density test because of her age and that she took calcium and vitamin D for the os-teopenia. When questioned about a 2008 report that she had bone pain, muscle ache and stiffness and a tingling sensation in the left side of her body, she explained that she, at times, had flu-like aches. Regarding a diagnosis for arthralgia and myalgia, she noted that the pain was in her hands and that, in May 2009, Dr. April Palmer diagnosed her with chronic joint pain, which she said affected her wrists as a result of working as a card dealer.

. Ms. Sanchez’s counsel stipulated that Dr. Mays restricted her from work for only two weeks during the summer of 2012.

. Counsel for Caesar’s stated that the Dictionary of Occupational Titles considers dealing cards at a casino a light-duty job.

. In addition to her testimony, Ms. Sanchez introduced into evidence records from Willis-Knighton Work Kare, Dr. April Palmer, Dr. John Mays and Dr. Milan Mody; an employer accident report; the 1007 employer report of injuiy; a video of the accident; wage record; indemnity payment record; her submission to the medical director; the medical guidelines dispute decision; Dr. Mody’s deposition; and an affidavit of litigation expenses.
Caesar’s introduced into evidence the 1008 form; records from Louisiana Family Practice, Orthopedic Specialists of LA, Casey Aaron, Willis-Knighton Bossier, Tri-State Physical Therapy, Dr. April Palmer, Dr. Larry Broadwell, Christus Schumpert Health System, Work Kare of Willis Knighton, Bossier Orthopaedics & Sports Medicine, Northwest Imaging, The Orthopedic Clinic, and State IME Dr. Holladay; transcripts of Dr. Holla-day’s deposition and Dr. Mays's deposition; Ms. Sanchez's answers to interrogatories; and a dictionary of occupational titles for a gambling dealer.

. The WCJ also discussed the opinion of Dr. Holladay, who performed the IME. The WCJ noted that Dr. Holladay's practice consists primarily of giving second medical opinions and suggested that the nature of his practice "undercuts the presumed absence of bias” of an IME. The WCJ further pointed out that Dr. Holladay did not review Ms. Sanchez's lumbar MRI films. The WCJ chose to at least discount, and perhaps disregard entirely, Dr. Holladay’s IME report.

. LAC 40:1.2109(A)(5)(a) states, in pertinent part:
5. Injections-Diagnostic
a. Spinal Diagnostic Injections:
i. Description — generally accepted, well-established procedures. These injections may be useful for localizing the source of pain, and may have added therapeutic value when combined with injection of therapeutic medication(s). Each diagnostic injection has inherent risks, and risk versus benefit should always be evaluated when considering injection therapy. Since these procedures are invasive, less invasive or non-invasivé procedures should be considered first. Selection of patients, choice of procedure, and localization of the level for injection should be determined by clinical information indicating strong suspicion for pathologic condition(s) and the source of pain symptoms.
(a).
[[Image here]]
v. Specific Diagnostic Injections. In general, relief should last for at least the duration of the local anesthetic used and should significantly relieve pain and result in functional improvement. Refer to Therapeutic Injections for information on other specific therapeutic injections. The following injections are used, primarily for diagnosis:
[[Image here]]
(b). Transforaminal Injections/Selective Nerve Root Blocks are useful in identifying spinal pathology. When performed for diagnosis, small amounts of local anesthetic up to a total volume of 1.0 cc should be used to determine the level of nerve root irritation. A positive diagnostic block should result in a positive diagnostic functional benefit and an 50 percent reduction in nerve-root generated pain appropriate for the anesthetic used as measured by accepted pain scales (such as a VAS).

. LAC 40:1.2111(C)(4)(e) states, in pertinent part:
4. Injections — Therapeutic
[[Image here]]
e. The physician must be aware of the possible placebo effect as well as the long-term effects of injections related to the patient’s physical and mental status; Strict adherence to contraindications, both absolute and relative, may prevent potential complications. Subjecting the patient to potential risks, i.e., needle trauma, infection, nerve injury, or systemic effects of local anesthetics and corticosteroids, must be considered before the patient consents to such procedures,
i. Spinal Therapeutic Injections
,(a). General Description. The following injections are considered to be reasonable treatment for patients with chronic pain. Other injections not listed may be beneficial. Therapeutic spinal injections may be used after initial conservative treatments, such as physical and occupational therapy, medication, manual therapy, exercise, acupuncture, etc., have been undertaken. Therapeutic injections should be used only after imaging studies and diagnostic injections have established pathology. Injections are invasive procedures that can cause serious complications; thus clinical indications and *1294 contraindications should be closely adhered to. The purpose of spinal injections is to facilitate active therapy by providing short-term relief through reduction of pain and inflammation. All patients should continue appropriate exercise with functionally directed rehabilitation. Active treatment, which patients should have had prior to injections, will frequently require a repeat of the sessions previously ordered (Refer to Active Therapy). Injections, by themselves, are not likely to provide long-term relief. Rather, active rehabilitation with modified work achieves long-term relief by increasing active ROM, strength, and stability. If the first injection does not provide a diagnostic response with temporary and sustained pain relief substantiated by accepted pain scales, (i.e., 50 percent pain reduction), and improvement in function, similar injections should not be repeated. Cervical injections are invasive procedures that can cause catastrophic complications. Refer to the Cervical Spine Injury guideline for more specific contraindications.
[[Image here]]
(e). Epidural Steroid Spinal Injections
(i). Description — Epidural steroid injections (ESI) deliver corticosteroid into the epidural space. The purpose of ESI is to reduce pain and inflammation, restoring range of motion and thereby facilitating progress in more active treatment programs. ESI uses three approaches: transforaminal, translaminar (midline), and caudal.
(ii). For ESI in the low back, the trans-foraminal approach is the preferred method for unilateral, single-level pathology and for post-surgical patients. Also for the low back, there is good evidence that the transforaminal approach can deliver medication to the target tissue with few complications and can be used to identify the specific site of pathology. The interlaminar approach is the preferred approach for multi-level pathology or spinal stenosis in the lumbar spine. Caudal therapeutic injections may be used, but it is difficult to target the exact treatment area, due to diffuse distribution.
[[Image here]]
(iv). Indications — There is some evidence that epidural steroid injections are effective for patients with radicular pain or radiculopathy (sensory or motor loss in a specific dermatome or myotome). Although there is no evidence regarding the effectiveness of ESI for non-radicular pain, it is a generally accepted intervention. Only patients who have pain affected by activity and annular tears verified by appropriate imaging may have injections for axial pain.