# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1106

**GAY LOWERY**

**VERSUS**

**JENA NURSING AND REHABILITATION, ET AL.**

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT-1E
PARISH OF OUACHITA, NO. 14-3212
THE HONORABLE BRENZA IRVING-JONES,
WORKERS' COMPENSATION JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**C. Daniel Street**
**Street & Street**
**508 N. 31st Street**
**Monroe, LA   71201**
**(318) 325-4418**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Gay Lowery**

**Stephanie L. Cheralla**
**Degan, Blanchard & Nash**
**400 Poydras Street, Suite 2600**
**New Orleans, LA   70130**
**(504) 529-3333**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**Jena Nursing and Rehabilitation**
**Technology Insurance Company**

**AMY, Judge.**

The claimant was injured while assisting a coworker to reposition a patient and has been receiving workers' compensation benefits. The claimant sought approval for a cervical fusion from the medical director pursuant to La.R.S. 23:1203.1, but was denied. The claimant appealed the medical director's decision to the workers' compensation judge. After a hearing, the workers' compensation judge reversed the medical director's decision and ordered that the insurer authorize the surgery. The employer and insurer appeal. For the following reasons, we affirm.

### Factual and Procedural Background

In 2012, the claimant, Gay Lowery, was working for Jena Nursing & Rehabilitation when she was injured while helping reposition a patient. Ms. Lowery began receiving workers' compensation benefits thereafter. In this particular dispute, Ms. Lowery sought approval from the workers' compensation insurer, Technology Insurance Company, for a cervical fusion. After the insurer denied the request, Ms. Lowery sought a determination from the medical director, pursuant to La.R.S. 23:1203.1. The medical director issued a decision finding that the indications for cervical fusion had not been met and denying Ms. Lowery's request for the surgery.

Ms. Lowery appealed the medical director's decision to the workers' compensation court. After a hearing at which Ms. Lowery testified, the workers' compensation judge overturned the medical director's decision and ordered the defendants to provide the surgery.

The defendants appeal, asserting as error that:

1. The compensation judge erred in reversing the decision of the medical director.

2. There is no clear and convincing evidence that the medical director's decision is not in accordance with the medical treatment guidelines.

**Discussion**

*La.R.S. 23:1203.1*

Louisiana Revised Statutes 23:1203.1 was enacted in order to ensure that medical treatment and other health care services are delivered in an efficient and timely manner to injured employees. La.R.S. 23:1203.1(L); *see also Church Mut. Ins. Co. v. Dardar*, 13-2351 (La. 5/7/14), 145 So.3d 271. To that end, La.R.S. 23:1203.1 provides a process for approval of medical care and the establishment of a medical treatment schedule, stating:

I. After the promulgation of the medical treatment schedule,[1] throughout this Chapter, and notwithstanding any provision of law to the contrary, medical care, services, and treatment due, pursuant to R.S. 23:1203, et seq., by the employer to the employee shall mean care, services, and treatment in accordance with the medical treatment schedule. Medical care, services, and treatment that varies from the promulgated medical treatment schedule shall also be due by the employer when it is demonstrated to the medical director of the office by a preponderance of the scientific medical evidence, that a variance from the medical treatment schedule is reasonably required to cure or relieve the injured worker from the effects of the injury or occupational disease given the circumstances.

J. (1) After a medical provider has submitted to the payor the request for authorization and the information required by the Louisiana Administrative Code, Title 40, Chapter 27, the payor shall notify the medical provider of their action on the request within five business days of receipt of the request. If any dispute arises after January 1, 2011, as to whether the recommended care, services, or treatment is in accordance with the medical treatment schedule, or whether a variance from the medical treatment schedule is reasonably required as contemplated in Subsection I of this Section, any

---

[1] The medical treatment schedule was promulgated and became effective in June 2011. *See Dardar*, 145 So.3d 271; 40 La.Admin Code Pt. I, § 2001, et seq.

2

aggrieved party shall file, within fifteen calendar days, an appeal with the office of workers' compensation administration medical director or associate medical director on a form promulgated by the director. The medical director or associate medical director shall render a decision as soon as is practicable, but in no event, not more than thirty calendar days from the date of filing.

. . . .

K. After the issuance of the decision by the medical director or associate medical director of the office, any party who disagrees with the decision, may then appeal by filing a "Disputed Claim for Compensation", which is LWC Form 1008. The decision may be overturned when it is shown, by clear and convincing evidence, the decision of the medical director or associate medical director was not in accordance with the provisions of this Section.

With regard to the standard of review for a workers' compensation judge's judgment affirming or overturning the medical director's decision, in *Vital v. Landmark of Lake Charles*, 13-842 (La.App. 3 Cir. 2/12/14), 153 So.3d 1017, a panel of this court concluded that, as the workers' compensation judge's analysis was necessarily fact-intensive, the manifest error—clearly wrong standard of review should apply. However, on the same date, in *Moran v. Cajun Well Services, Inc.*, 13-821 (La.App. 3 Cir. 2/12/14), 153 So.3d 1086, the panel noted that there were no findings of fact involved and concluded that the workers' compensation judge's determination was a question of law subject to de novo review. Since then, in *Mouton v. Lafayette Parish Sheriff's Office*, 13-1411 (La.App. 3 Cir. 10/15/14), __ So.3d__ (on rehearing), another panel of this court has applied the manifest error standard. We follow that developing jurisprudence, as the workers' compensation judge's determination was necessarily fact-intensive and, accordingly, the manifest error—clearly wrong standard of review is appropriate here. *See also Gillam v. Brooks Heating & Air Conditioning*, 49,161 (La.App. 2 Cir. 7/16/14), 146 So.3d 734. We further note that additional testimony and evidence was adduced at the hearing of this matter.

3

The relevant medical treatment guidelines concerning cervical injuries are found at 40 La.Admin. Code Pt. I, § 2003(A) and § 2011(F)(2)(c) (2015). Section 2003(A), states, in relevant part:

> The principles summarized in this section are key to the intended implementation of all Office of Workers' Compensation guidelines and critical to the reader's application of the guidelines in this document.
>
> 7. Re-Evaluation of Treatment Every Three to Four Weeks. If a given treatment or modality is not producing positive results within three to four weeks, the treatment should be either modified or discontinued. Reconsideration of diagnosis should also occur in the event of poor response to a seemingly rational intervention.
>
> 8. Surgical Interventions. Surgery should be contemplated within the context of expected improvement of functional outcome and not purely for the purpose of pain relief. The concept of "cure" with respect to surgical treatment by itself is generally a misnomer. All operative interventions must be based upon positive correlation of clinical findings, clinical course, and diagnostic tests. A comprehensive assimilation of these factors must lead to a specific diagnosis with positive identification of pathologic conditions. The decision and recommendation for operative treatment, and the appropriate informed consent should be made by the operating surgeon. Prior to surgical intervention, the patient and treating physician should identify functional operative goals and the likelihood of achieving improved ability to perform activities of daily living or work activities and the patient should agree to comply with the pre- and post-operative treatment plan and home exercise requirements. The patient should understand the length of partial and full disability expected post-operatively.

Further, Section 2011(F)(2)(c), which addresses operative therapeutic procedures, states, in relevant part:

> General indications for surgery. [O]perative intervention should be considered and a consultation obtained when improvement of symptoms has plateaued and the residual symptoms of pain and functional disability are unacceptable at the end of six weeks of treatment, or at the end of longer duration of non-operative intervention for debilitated patients with complex problems. Choice of hardware instrumentation is based on anatomy, the patient's pathology, and surgeon's experience and preference.
>
> i. Specific indications include:
>     . . . .

4

(b).    for patients with cervical radiculopathy:

(i).    early intervention may be required for acute incapacitating pain or in the presence of progressive neurological deficits;

(ii).    persistent or recurrent arm pain with functional limitations, unresponsive to conservative treatment after six weeks; or

(iii).    progressive functional neurological deficit; or

(iv).    static neurological deficit associated with significant radicular pain; and

(v).    confirmatory imaging studies consistent with clinical findings;

(c).    for patients with persistent non-radicular cervical pain: in the absence of a radiculopathy, it is recommended that a decisive commitment to surgical or nonsurgical interventions be made within four to five months following injury. The effectiveness of three-level cervical fusion for non-radicular pain has not been established. In patients with non-radicular cervical pain for whom fusion is being considered, required pre-operative indications include all of the following.

(i).    In general, if the program of non-operative treatment fails, operative treatment is indicated when:

[a].    improvement of the symptoms has plateaued, and the residual symptoms of pain and functional disability are unacceptable at the end of 6 to 12 weeks of active treatment, or at the end of longer duration of non-operative programs for debilitated patients with complex problems; and/or

[b].    frequent recurrences of symptoms cause serious functional limitations even if a non-operative active treatment program provides satisfactory relief of symptoms, and restoration of function on each recurrence;

[c].    mere passage of time with poorly guided treatment is not considered an active treatment program;

(ii).    all pain generators are adequately defined and treated; and

(iii).    all physical medicine and manual therapy interventions are completed; and

(iv).    x-ray, MRI, or CT/discography demonstrating disc pathology or spinal instability; and

(v).    spine pathology limited to two levels; and

5

(vi). psychosocial evaluation for confounding issues addressed;

(vii). for any potential surgery, it is recommended that the injured worker refrain from smoking for at least six weeks prior to surgery and during the period of healing. Because smokers have a higher risk of non-union and higher post-operative costs, it is recommended that insurers cover a smoking cessation program peri-operatively.

Citing these guidelines, the medical director determined that the indications for cervical fusion had not been met. Noting specific portions of Ms. Lowery's medical records, the medical director stated:

- FOR PATIENTS WITH CERVICAL RADICULOPATHY

  o No documentation of recurrent arm pain with functional limitations, unresponsive to conservative treatment after six weeks

  o No documentation of recent active therapy intervention submitted by provider

  . . . .

  o No documentation of progressive functional neurological deficit

  . . . .

  o No documentation of static neurological deficit associated with significant radicular pain; and

  o Confirmatory imaging studies consistent with clinical findings

  . . . .

- FOR PATIENTS WITH NON-RADICULAR CERVICAL PAIN FOR WHOM FUSION IS BEING CONSIDERED

  o Psychosocial Evaluation has not been submitted

The medical director essentially concluded that Ms. Lowery had failed to meet any of the indicators contained in 40 La.Admin. Code Part I, § 2011(F)(2)(c). However, the workers' compensation judge found that Ms. Lowery had shown that

6

all of the indicators for surgery had been met through either Ms. Lowery's testimony or the medical evidence and that she had met her burden of proof with regard to overturning the medical director's decision.

Our review of the record indicates that Ms. Lowery's medical records were submitted into evidence. The records show that Ms. Lowery was initially treated for problems with her mid and lower back, but after a CT scan showed stenosis at C7-T1, her records show increased focus on her cervical and upper thoracic spine.

Records from Ms. Lowery's treating neurosurgeon, Dr. Michael Drerup, indicate that in December of 2013, several months after the CT scan showed stenosis at C7-T1, he diagnosed her with "chronic mechanical thoracolumbar pain secondary to moderately severe spinal stenosis C7-T1, recalcitrant to all medical therapy to date including cervical epidural steroid injections." Dr. Drerup's records indicate that Ms. Lowery reported cervical pain radiating into the upper extremities over the course of several months.[2]

---

[2] For example, on July 24, 2013, Dr. Drerup noted that "Mrs[.] Lowery continues to complain of pain beginning in the intrascapular region radiating into the entirety of the thoracic spine, into the lumbrosacral region, and into the posterior aspect of the right lower extremity. Symptoms are mechanically exacerbated." Dr. Drerup also noted on that date that Ms. Lowery's thoracic and lumbar myelogram shows moderately severe spinal stenosis C7-T1 and entered a new impression of "Stenosis – cervical."

On October 24, 2013, Dr. Drerup noted that "Mrs. Lowery reports one week of relief with cervical epidural steroid injections. Her symptoms have returned to baseline since that time. She reports intermittent posterior cervical pain radiating into the trapezius, into the deltoid region, into the anterior aspect of the arm and forearm, including the index finger, right. She reports intermittent tingling in the entirety of the right hand."

On November 25, 2013, Dr. Drerup noted that "Mrs. Lowery continues to report poster[ior] cervical pain radiating into the trapezius muscles, into the deltoid region, into the anterior aspect of the arm and forearm bilaterally, including the index finger right. She reports intermittent tingling in the entirety of the right hand. She reports numbness to the medial aspect of the left forearm."

On December 23, 2013, Dr. Drerup noted that "Mrs. Lowery continues to suffer posterior cervical pain radiating into the upper extremities as previously documented." Dr. Drerup's impression noted on that date was "chronic mechanical thoracolumbar pain secondary to moderately severe spinal stenosis C7-T1, recalcitrant to all medical therapy to date including cervical epidural steroid injections." Ms. Lowery's neurosurgery notes from February 7, 2014, and March 11, 2014, contain similar notations.

Records from physical therapy indicate that Ms. Lowery underwent 24 treatments in 2012 with minimal improvement. Although the primary focus of Ms. Lowery's treatment at that time was her thoracic and lumbar spine complaints, there is some documentation of cervical pain and therapy to the cervical spine. Additionally, Dr. Drerup's medical records show that Ms. Lowery had cervical epidural steroid injections, reporting only one week of relief after the injection and that her symptoms returned "to baseline" after that. Similarly, a second medical opinion provided by Dr. Jorge Martinez noted that Ms. Lowery "has been treated with epidural steroid injection three times for what the patient describes will afford relieve [sic] for a week and a half."

Ms. Lowery also obtained several imaging studies. One of those, a CT scan performed on July 17, 2013, concluded that Ms. Lowery had "central stenosis at C7-T1", noting "[t]here is a posterior central disc and osteophyte noted at the C7-T1 level. Anterior-to-posterior central thecal sac is approximately 8.5 to 9 mm suggesting some central stenosis. The upper thoracic region shows some central posterior disc and osteophyte but no high-grade central stenosis."

Ms. Lowery also testified at the hearing, stating that her injury began between her shoulder blades, and that she also had complaints about her low back, her injuries have gotten worse over time. Specifically she testified that:

> It's like a continuance [sic] burn and hurt, and it's radiating down both my arms. On this side--on my left side, it's like numb on the outer part of my arm, like going into my little finger. And then on my right arm it's like--feels like--it's a pain radiating all the way down. And it's like my thumb and index finger would draw and I couldn't--you can't hardly move it or anything for a while, and it got--it happens off and on all the time. And, I mean, I'm still continuously--my back burns and it's going up my neck, and now I have continuous head aches.

8

Ms. Lowery testified that she has pain and numbness in her arms and into her hands and fingers, and that she "doesn't have to be doing anything." Further, Ms. Lowery testified that she has had several months of physical therapy and injections in her back. She stated that she has had very little relief from the injections. According to Ms. Lowery's testimony, she is unable to pick up her grandchildren or do housework. Ms. Lowery also confirmed that she had had imaging studies done, including an MRI and myelogram.

Having reviewed the record, we find that it contains a reasonable basis for the workers' compensation judge's conclusion that Ms. Lowery showed by clear and convincing evidence that the indicators for surgery, specifically those for patients with cervical radiculopathy, had been met through either Ms. Lowery's testimony or the medical evidence. Accordingly, we find that the workers' compensation judge was not clearly wrong or manifestly erroneous in overturning the medical director's decision.

The appellants' assignments of error addressing this issue are without merit.

### DECREE

For the foregoing reasons, the trial court's judgment overturning the medical director's decision is affirmed. Costs of this matter are assessed to the appellants, Jena Nursing and Rehabilitation and Technology Insurance Company.

**AFFIRMED.**