GARRETT, J.
liThe defendants, Marsala Beverage Company' (“Marsala”) and its- insurer, LUBA Casualty Insurance Company (“LUBA”), appeal a decision by a workers’ compensation judge (“WCJ”) reversing the denial of medical treatment by the Associate Medical Director (“AMD”) of the Office of Workers’ Compensation (“QWG”), For the following reasons, we affirm.
FACTS
On November 4, 2010, the plaintiff, James Arness Thomas, a forklift operator for Marsala, was loading an 18-wheeler delivery truck. The truck driver pulled forward unexpectedly and Thomas, seated on the forklift, fell from the- back of the truck. The back of the forklift hit the ground first, and then the front. It is not disputed that the accident occurred, that it arose out of and in.the course of Thomas’s employment, and that - he was injured. Thomas was ‘42 years old and had been working for Marsala for more than eight years. Thomas claimed he suffered injuries to his neck, back,-arms, and-wrists. He returned to work briefly, but later was taken off .work and. has been under treatment with various physicians since the accident. Marsala admits that Thomas is temporarily disabled and has paid compensation and some medical benefits.
Thomas was initially treated by Dr. Ronald Woods, a family practice physician. Because his symptoms did not improve with medication, an MRI of the lumbar spine was done on December 1, 2010. The MRI did not Show a herniated disc.
Thomas was referred to an orthopedist, Dr. Douglas C. Brown, who initially saw Thomas in February 2011. On February 23, 2011,. Thomas had |aan MRI of his cervical spine, which was unremarkable; In March. 2011, Dr. Brown performed injections at the L4-f> and L5-S1 .levels, which provided pain relief for a few days. Marsala’s insurer, LUBA, refused to. cover additional injections. Physical therapy and work hardening were also prescribed for Thomas. Therapy was terminated due to high blood pressure and swelling in the right lower extremity.
In August 2011, Dr. Marco Ramos, a neurosurgeon, determined that Thomas had cervical radiculopathy, lumbosacral radiculopathy, bilateral median nerve entrapment in the upper extremities, and vascular pathology in the right lower extremity. In January 2013, Dr. -Ramos found that Thomas had manifestations of cervical strain* with mild .radiculopathy. Another round -of. physical therapy was attempted, but was terminated due to worsening of pain.
*622 In June 2013, Thomas was diagnosed with carpal tunnel syndrome and surgery was recommended. Thomas eventually had the surgery, but LUBA did not pay because it asserted that this condition was not related to the accident. Thomas was treated by Dr. Ramos through June 2013.
While Thomas was being treated by Dr. Ramos, LUBA referred him to Dr. Donald Smith with Select Evaluation Center in November 2011, for an impairment evaluation. Dr. Smith issued a report that outlined the plaintiffs treatment history and noted that an MRI of the plaintiffs lumbar spine in December 2010 was unremarkable. Dr. Smith noted a normal spinal examination and normal spinal imaging in both the lumbar and cervical areas. Dr. Smith saw Thomas again on October 15, 2012, for | ..¡another impairment evaluation. The plaintiff reported stiffness in his neck and a pinching sensation in his low back, with pain radiating down both legs. Thomas was also experiencing swelling of his feet and legs. Dr. Smith noted that the plaintiffs range of motion in his low back was moderately restricted and his cervical range of motion was mildly restricted. Dr. Smith found no information to change his previous report of a normal spinal examination. He stated that the plaintiffs prognosis for return to work at Marsala was poor, but then stated'that the plaintiff should be able to return to a wide variety of work activities with no restrictions.
Following his treatment by Dr. Ramos, Thomas sought treatment from Dr. Eric Oberlander, a neurosurgeon, in July 2013. After examining the MRI done in December 2010, Dr. Oberlander determined that it was of such poor quality that it should be redone and specified that it should be read by a different radiologist. The new MRI was performed in August 2013; it showed spondylosis and stenosis at multiple levels with a concentric bulge in the L5-S1 area of the lumbar spine. Dr. Ob-erlander determined that Thomas was not a candidate for surgery.
In November 2013, Dr. Oberlander referred Thomas to Dr. Benjamin G. Kidder, a neurologist. Thomas was then referred to Dr. Vincent R. Forte, an anesthesiologist who specializes in pain management. LUBA initially resisted this referral. In November 2013, the plaintiff filed a disputed claim for compensation in order to see Dr. Forte. LUBA then apparently approved the referral.
|4In January 2014, Thomas began treatment with Dr. Forte. The plaintiff complained of pain in the neck, back, shoulders, and bilateral upper and lower extremities. He had shoulder and bilateral lower extremity pain. Dr. Forte noted limited range of motion in the lumbar and cervical spine due to pain. On January 30, 2014, Dr. Forte gave Thomas injections known as right lumbar medial branch blocks at the L2 through the L5 areas. Thomas reported a 50% improvement in his pain. On February 6, 2014, Dr. Forte , gave Thomas this same series of injections on the left side. Thomas reported a 25% improvement in his pain. According to Dr. Forte, the plaintiffs function was improved after the injections.
On February 20, 2014, Dr. Forte noted that Thomas did not feel that the injections had relieved his low back pain. However, on that date Thomas rated his pain at two out of 10. Dr. Forte noted a small disc bulge at L5-S1, and thought Thomas would benefit from an epidural steroid injection (“ESI”) at that level. A request by Dr. Forte to LUBA for coverage of this treatment was denied on February 24, 2014. -LUBA’s rationale was that Thomas “was seen by Dr. Donald Smith who did not recommend injections *623 or further therapy. The MRI of. the spine was unremarkable with - no evidence of nerve root compromise.”
The matter was then appealed to' the Medical Director with the OWC on February 25, 2014, and was sent to' him for review on March 5, 2014. The requested services wére submitted for review for medical necessity ahd appropriateness under the Louisiana Workers’ Compensation Medical Treatment Guidelines (“MTG”) of La. R.S. 23:1203.1 and LAC 40:1.2015 et |fiseq. On March 6, 2014, Dr. Roy M. Lee, AMD with the OWC, issued a rather lengthy letter that denied the ESI, finding it to be diagnostic and not allowed under the MTG.
On March 20, 2014, Thomas sought judicial review of the AMD’s decision. Á hearing was held by the WCJ on‘April’28, 2014. Although no live testimony was adduced, the plaintiffs medical records from his numerous providers and the deposition of Dr. Forte, taken on April 25, 2014, were admitted into evidence without any objection from the defendants. Also admitted were Dr. Smith’s reports, together with LUBA’s reasons for denying the injection.
Each side presented arguments to the WCJ in support of their respective positions. The matter was taken under advisement by the WCJ to review the evidence and briefs.
On July 17, 2014, the WCJ dictated extensive oral reasons for her ruling. The WCJ found that the medical records and other evidence showed by clear and convincing evidence that the AMD’s decision was not in accordance with the provisions of La. R.S. 23:1203.1, The review of the medical records and other evidence persuaded the court that the decision of the AMD was contradicted by the medical evidence. . A judgment reversing the decision of the AMD was signed by the WCJ on August 12, 2014.
Marsala and LUBA took a devolutive appeal. They argue that the WCJ committed legal and manifest error in concluding that Thomas proved by clear' and convincing evidence that the AMD’s denial of the ESI was improper under the MTG. This argument is without merit.
JgLEGAL PRINCIPLES
A workers’ compensation claimant may recover costs of medical treatment that is reasonably necessary for the treatment of a medical condition caused by a work injury. La. R.S. 23:1203(A); Gilliam, v. Brooks Heating & Air Conditioning, 49,161 (La.App.2d Cir.7/16/14), 146 So.3d 734. Enacted by the legislature in 2009, La. R.S. 23:1203.1 is the product of a combined endeavor by employers, insurers, labor, and medical providers to establish meanr ingful guidelines for the treatment of injured workers. La. R.S. 23:1203(A); Church Mut. Ins. Co. v. Dardar, 2013-2351 (La.5/7/14), 145 So.3d 271; Gilliam v. Brooks Heating & Air Conditioning, supra, La. R.S. 23:1203.1 was enacted with the express intent that, with the establishment and enforcement of the medical treatment schedule, medical and surgical treatment, hospital care, and other health care provider services shall be delivered in an efficient and timely manner to injured employees. La. R.S. 23:1203.1(L).[1] Medical necessity includes services that are in accordance with the MTG and are clinically appropriate and effective for the patient’s illness, injury or disease. LAC 40:I.2717; Gilliam v. Brooks Heating & Air Conditioning, supra. To be medically *624 necessary,, a service .must be consistent with the diagnosis and treatment of a condition or complaint, in accordance with the MTG, not solely for the convenience of the patient, family, hospital or physician, and furnished in the most appropriate and least intensive type of medical care setting 17required by the. patient’s condition. LAC 40:1.2717; Gilliam v. Brooks Heating & Air Conditioning, supra; Sanchez v. Caesar’s Entm’t, Inc., 49,864 (La.App.2d Cir.6/24/15), 166 So.3d 1283.
Regarding the procedure involved in pursuing a claim for medical treatment under this new law, La. R.S. 23:1203.1 provides, in relevant part:
I. After the promulgation of the medical treatment schedule, throughout this Chapter, and notwithstanding any provision of law to the contrary, medical care, services, and treatment due, pursuant to R.S.' 23:1203, et seq., by the employer to the employee shall mean care, services, and treatment in accordance with the medical treatment schedule. Medical care, services, and treatment that varies from the promulgated medical treatment schedule shall also be due by the employer when it is demonstrated to the medical director of the office by a preponderance of the scientific medical evidence, that a variance from the medical treatment schedule is reasonably required to cure or relieve the injured worker from the effects of the injury or occupational disease given the circumstances.
J.' (1) After a medical provider has submitted to tiie payor' the request for authorization and the information required by the Louisiana Administrative Code, Title'40, Chapter 27, the payor shall notify the medical provider of their action on the request within five business days of receipt of the request. If any dispute arises after January 1, 2011, as to whether the recommended care, services, or treatment is in accordance with the medical treatment schedule, or whether a variance from the medical treatment schedule is reasonably required as contemplated in Subsection I of this Section, any aggrieved party shall file, within fifteen calendar days, an appeal with the office of workers’ compensation administration medical director on a form promulgated by the director. The medical director shall render a decision as soon as is practicable, but in no event, not more than thirty calendar days from the date of filing.
[[Image here]]
K.After the issuance of the decision by the medical director of the office, any party who disagrees with the decision, may then appeal by filing a “Disputed Claim for Compensation,” which is LWC Form 1008. The decision may be overturned when it is shown, by clear and convincing evidence, the decision of the medical director or associate medical director was not in accordance with the provisions of this Section.
IsBefore the enactment of La. R.S, 23:1203.1, the determination of what medical treatment was appropriate was entrusted first to the insurer. La. R.S. 23:1142. If a dispute arose regarding whether a particular treatment was reasonable and necessary, the task of resolving the dispute was given to the WCJ, who would review the case under the preponderance of the evidence standard to determine what treatment was medically necessary under the circumstances. Under the new law, a claimant seeking judicial review of the Medical Director’s decision must prove the necessity of the sought-after medical treatment by clear and convincing evidence. However, under La. R.S. 23:1208.1(1) and (M)(2), the claimant’s initial burden before the Medical Director remains one of proof *625 by a. preponderance of the evidence. Church Mut Ins. Co. v. Bardar, supra; Gilliam v. Brooks Heating & Air Conditioning, supra.
The “clear and,convincing” standard in a workers’ compensation case, applicable to the appeal to the WCJ, is an intermediate standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard. Hollingsworth v. Steven Garr Logging, 47,884 (La.App.2d Cir.2/27/13), 110 So.3d 1219; Gilliam v. Brooks Heating & Air Conditioning, supra. To prove a matter by “clear and convincing” evidence means to demonstrate that the existence of,the disputed fact is highly probable or much more probable than its nonexisténce. Hollingsworth v. Steven Garr Logging, supra; Gilliam v. Brooks Heating & Air Conditioning, supra.
IflFactual findings of a WCJ are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 1996-2840 (La.7/1/97), 696 So.2d 551; Gilliam v. Brooks Heating & Air Conditioning, supra. See also Guidry v. American Legion Hosp., 2014-1285 (La.App. 3d Cir.4/1/15), 162 So.3d 728; Lowery v. Jena Nursing & Rehab., 2014-1106 (La.App. 3d Cir.4/1/15), 160 So.3d 620; Aisola v. Beacon Hosp. Mgmt, Inc., 2013-1101 (La.App. 4th Cir.4/2/14), 140 So.3d 71. To reverse a factfinder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact;-and (2) the court must further determine the record establishes the finding is clearly wrong. Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993); Gilliam v. Brooks Heating & Air Conditioning, supra.
DISCUSSION
Here, the AMD determined that the clinical findings, history of the disease, the clinical course, and diagnostic tests did not correlate to support the requested service, and the source of the pain was unclear. He determined that ESI was not medically necessary because: (1) it was not in compliance with the medical treatment schedule; (2) the alleged disease and treatment did not correlate to support the need for ESIs; ‘and (3) the submitted medical records did not .clearly indicate the source of the claimant’s pain.
hnThe AMD noted that the MTG=for diagnostic injections generally accept only transforaminal injections/spinal selective nerve blocks in identifying spinal pathology. He found there was insufficient clinical information indicating strong suspicion for pathological-condition and the source of pain -symptoms. He noted the prior lumbar medial branch blocks and found it was unclear from- the medical records that there was strong evidence for the source of pain. Dr. Lee cited the MRI done in August 2013, which showed “canal and fo-ramina patent” with “no evidence of obvious' nerve root compromise,” although he mentioned the concentric bulge at L5-S1. Dr. Lee concluded there was "no documentation that the proposed procedure is being done to facilitate active therapy.”
Regarding diagnostic injections, the AMD cited portions of LAO 40:1.2019(0). The .pertinent portions of that quote are as follows:
2. Other tests. The following diagnostic procedures in this subsection are listed in alphabetical order, not by importance:
b. Injections-^-Diagnostic
*626 i. Description. Diagnostic spinal injections are generally accepted, well-established procedures. These injections may be useful for localizing the source of pain,, and may have added therapeutic value when combined with injection of therapeutic medication(s). Each diagnostic injection has inherent risks, and risk versus benefit should always be evaluated when considering injection therapy.
ii. Indications. Since these procedures are invasive, less invasive or noninvasive procedures should be considered first. Selection of patients, choice of procedure, and localization of the level for injection should be determined ■ by clinical information indicating strong suspicion for pathologic, eondition(s) and the source of pain symptoms. Because injections are invasive with an inherent risk, the number of diagnostic procedures should be limited in any individual patient to those most likely to be primary pain generators. Patients should not receive all of the diagnostic blocks listed merely in an attempt to identify ■ 100 percent of the pain generators.
Iniii. The- interpretation - of the test results are primarily based on functional change, symptom report, and' pain response (via a recognized pain scale), before and at an appropriate time period after the injection. The diagnostic significance of the test result should be evaluated in conjunction with clinical information and the results of other diagnostic procedures. Injections with local anesthetics of differing duration may be used to support a diagnosis. In some cases, injections at multiple levels may be required to accurately diagnose low back pain. (Refer to Injections — Therapeutic for information' on specific injections.)
(a). It is obligatory that sufficient data be accumulated by the examiner performing this procedure such that the diagnostic value of the procedure be evident to other reviewers. This entails, at a minimum, documentation of patient response immediately following the proce- ' dure with details of any symptoms with a response and the degree of response. Additionally, a log must be recorded as part of the medical record which documents response, if any, on an hourly basis for, at a minimum,' the' expected duration of the local anesthetic phase of the procedure. Responses must be identified as to specific body part (e.g., low back, leg pain). The practitioner must identify the local anesthetic used and the expected duration of response for diagnostic purposes.
. (b). Multiple injections. provided at the same session without staging may seriously dilute the diagnostic value of these procedures. Practitioners must carefully weigh the diagnostic value of the, procedure against the possible therapeutic value.
[[Image here]]
vii. Specific Diagnostic Injections. In general, relief should last for at least the duration of the local anesthetic used and should significantly relieve pain and result in functional improvement. Refer to “Injections — Therapeutic” for information on specific therapeutic injections.
(a). Medial Branch Blocks are generally accepted diagnostic injections, used to determine whether a patient is a candidate for radiofrequency medial branch neurotomy (also known as facet rhizotomy). ISIS suggests controlled blocks, using either placebo or anesthetics with varying lengths of .activity (i.e., bupivacaine longer than lidocaine). To be a positive diagnostic block, the patient should report a reduction of pain of 50 percent or greater relief *627 from baseline for the length of time appropriate ‘ for the local anesthetic used. In almost all cases, this will mean a reduction of pain to one or two on the Visual Analog Scale (VAS) 10-point scale correlated with functional improvement. The patient should also identify activities of daily living (which may include measurements of range of motion) that are impeded by their hapain and can be observed to document functional- improvement in the clinical setting. Ideally, these activities should be assessed throughout the observation period for function. The observer should - not be the physician who performed the procedure. It is suggested that this be recorded on a form similar to ISIS recommendations or American Society of Interventional Pain Physicians (ASIPP).
The AMD also cited portions of LAC 40:1.2021(H) of the MTG dealing with therapeutic injections. At the time of the AMD’s decision, the pertinent portions of that provision stated:
3. Injections — Therapeutic
a. Therapeutic Spinal Injections. Description — Therapeutic spinal injections may be used after initial conservative treatments, such as physical and ' occupational therapy, medication, manual therapy, exercise, acupuncture, etc., have been undertaken. Therapeutic injections should be used only after imaging studies and diagnostic injections have established pathology. Injections are invasive procedures that can cause serious complications; thus clinical indications and contraindications should be closely adhered to. The purpose of spinal injections is to facilitate active therapy by ' providing short-term relief through reduction of pain and inflammation. All patients should continue appropriate exercise with functionally directed rehabilitation. Active treatment, which patients should have had prior to injections, will frequently require a repeat of the sessions previously ordered (Refer to Active Therapy). Injections, by themselves, are not likely to provide long-term relief. Rather, active rehabilitation with modified work achieves long-term relief by increasing active ROM, strength, and stability. ' Subjective reports of pain response (via a recognized pain scale) and function should be considered and given relative weight when the pain has anatomic and physiologic correlation. Anatomic correlation must bé based on objective findings.
[[Image here]]
iv. Epidural Steroid Injection (ESI)
(a). Description. Epidural steroid injections are injections of corticosteroid into the epidural space. The purpose of ESI is to reduce pain and inflammation in the acute or sub-acute phases of injury, restoring range of motion arid, thereby, facilitating progress in more active treatment prograrns. ESI uses three approaches: transforairiinal/Spinal Selective Nerve Block (SNRB), interlami-nar (midline), and caudal. The transfor-aminal/Spinal Selective ' Nerve Root Block approach is h ¡¡the preferred method for unilateral, single-level pathology and for post-surgical patients. There is good evidence that the' trahsforami-nal/Spinal Selective Nerve Root Block approach can deliver medication to the target tissue with few complications and can be used to identify the specific site of pathology. The interlaminar approach is the preferred approach for multi-level pathology, or spinal stenosis. Caudal- therapeutic injections may be used, but it is difficult to target the exact treatment area, -due to diffuse distribution. . ■ .
[[Image here]]
*628 (c). Indications. There is some evidence that. epidural steroid injections are effective for patients with radicular pain or radiculopathy (sensory or motor loss in a specific dermatome or myo-tome). Up to.80 percent of patients •with radicular pain may have initial relief. However, only 25-57 percent are likely to have excellent long-term relief. Although there is no evidence regarding the effectiveness of ESI for non-radicu-lar disc herniation, it is an accepted intervention. Only patients who have pain affected by activity and annular tears verified by appropriate imaging may have injections for axial pain.
It is obvious from the record that the WOJ thoroughly examined the medical records spanning more, than three years, as well as Dr. Forte’s deposition, and determined that the plaintiff had shown by clear and convincing evidence that the AMD’s decision should be reversed.[2] According to the WCJ, Dr. Forte diagnosed Thomas with lumbar facet joint syndrome. He was given lumbar medial branch blocks on the right and left. Dr. Forte then recommended an ESI, which was denied by LUBA, based upon an evaluation by Dr. Smith. The AMD also denied the request, finding that the documentation did not support the approval of the requested services. The WCJ found that the latest MRI showed a concentric bulge of luthe disc at L5-S1 and the proposed ESI was not only for diagnostic purposes, but also for relief of the pain Thomas has suffered for the last three years. While other conservative measures had failed to relieve the pain, Thomas did receive some pain relief.from the facet injections given by Dr. Brown and later by Dr. Forte. Thomas also showed that the 2013 MRI, his medical history, physical findings, and tests demonstrate; a strong suspicion that the source of the pain is in the L5-S1 area of the lumbar spine.
The record in this matter shows that the WCJ was not manifestly erroneous or clearly wrong in overturning the decision of the AMD. The medical evidence and deposition support the WCJ’s conclusion that the source of Thomas’s pain was at the L5-S1 level. Prior lumbar medial branch blocks administered by Dr. Brown and Dr. Forte had provided some relief. In his deposition, Dr. Forte stated that the disc bulge at L5-S1 indicated that Thomas’s pain was coming from the disc, not the joint, and would be aided by the ESI. He explained that the ESI would cover the L4-5 and L5-S1 dermatomes and would give Thomas an opportunity to get better.
.The record supports .the decision by the WCJ that there was dear and ..convincing evidence that the AMD erred in finding that the ESI was diagnostic and not therapeutic. Thomas was diagnosed with cervical and lumbar radiculopathy by Dr. Ramos. The plaintiff described to Dr. Smith pain from his back radiating down both legs. He experienced pain relief from injections by Dr. Brown at the L4-5 and L5-S1 level in 2011. He also experienced some pain relief and function improvement following the | ^injections given by Dr. Forte in 2014. Thomas also had a documented disc bulge at L5-S1. These fae- *629 tors establish strong evidence for the source of the plaintiffs pain and support the use of the, ESI for therapeutic purposes under.the MTG, and not just for diagnostic purposes. The record supports the decision by the WCJ 'that-the ESI is medically necessary, contrary to the opin? ion of the AMD. The WCJ was not manifestly erroneous : in finding that Thomas was entitled to receive the ESI.'
CONCLUSION
For the reasons stated above, we affirm the decision of the Office of Workers’ Compensation in favor of the plaintiff, James Arnéss Thomas, ordering the defendants, Marsala Beverage Company and its insurer, LUBA Casualty Insurance' Company, to provide the ESI recommended by Dr. Vincent Forte. Costs in this appeal are assessed to the defendants.
AFFIRMED.

. We cannot help but note that, in this particular case, more than 18-months have now lapsed from the time -the treatment was requested and the rendition of this opinion. Whether this is efficient and timely is certainly debatable..

. We recognize that the AMD did not have the benefit of Dr. Forte's deposition, which was not taken until shortly before the hearing before the WCJ. Under the jurisprudence interpreting the new statutory scheme, the WCJ may consider additional evidence which was not provided to the AMD. See Gilliam v. Brooks Heating & Air Conditioning, supra. This deposition provided a straightforward, commonsense, and cogent explanation for why the ESI treatment recommended by Dr. Forte was medically necessary. The WCJ agreed with the opinions expressed by the physician to whom the plaintiff had been referred for pain management.